**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 18-20025-01-DDC** |
| **GEORGE BUSH, JR. (01),** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

### Background

A jury convicted defendant George Bush on multiple felony drug charges on March 10, 2020.  The charges included conspiracy to distribute and possess with intent to distribute heroin, violating 21 U.S.C. §§ 846, 841(b)(1)(B)(i) & 841(a)(1).  The United States Probation Office conducted the usual presentence investigation and prepared an extensive (219 paragraphs) Presentence Investigation Report (PSR).  Mr. Bush objected to 39 of the report's paragraphs and both parties announced they intended to present evidence on sentencing issues.

The arrival of the COVID-19 pandemic delayed the evidentiary proceedings, but the court finally convened the sentencing hearing and heard evidence on August 13 and 14, 2020.  In a second phase of the sentencing hearing on December 21, 2020, the court ruled some but not all of Mr. Bush's objections.  The court also decided the government's lone objection.  These efforts left unresolved the most challenging issue raised by defendant's objections—the drug quantity determination under U.S. Sentencing Guideline Manual § 2D1.1(a)(5) (U.S. Sentencing Commission 2018).  The court also heard arguments by counsel at a final sentencing hearing conducted on April 13, 2021.  During this hearing, the court addressed defendant's last two drug

quantity disputes and then made a finding about Mr. Bush's personally accountable drug quantity. The court then announced the required sentencing guideline findings and heard the parties' sentencing comments. The court then imposed sentence.

Part I of this Memorandum and Order memorializes the court's ruling on the quantity issue and defendant's many objections on that subject. Based on the analysis recited in this Order, the court finds Mr. Bush personally accountable for 2,217.6 kilograms of heroin and thus sustains his quantity objections in part but denies them in other respects. Part II of this Order revises the court's oral ruling on Mr. Bush's objection to ¶ 133 of the Presentence Report. *See* Doc. 277 at ¶¶ 286-88. Paragraph 133 applied a four-level adjustment under § 3B1.1(a) for Mr. Bush's aggravating role in the offense. During the December 21 hearing, the court initially ruled that Mr. Bush should receive a two-level enhancement under § 3B1.1(c), not the four-level enhancement applied by ¶ 133. But after reviewing the government's concerns about the court's oral ruling on this objection, the court concludes that Mr. Bush should receive the three-level enhancement under U.S. SENTENCING GUIDELINE MANUAL § 3B1.1(b).

The court now explains how it reached these conclusions.

I.     **PERSONALLY ACCOUNTABLE DRUG QUANTITY**

A drug offender's personally accountable drug quantity is an important ingredient to his guideline calculation. *See* U.S. SENTENCING GUIDELINE MANUAL § 2D1.1(a)(5). Often, this factfinding is daunting work. As a rule, drug traffickers don't keep great inventory records. Mr. Bush is no exception. This characteristic of his heroin endeavors leaves room for significant disagreement about attributable drug quantity. Mr. Bush claims he is responsible for less than 400 grams of heroin—and not the 3.21 kilograms attributed by the PSR. If his view prevails his

base offense level falls from 32 to 24 and, all else remaining the same, his Guidelines range falls from 292–365 months to 121–151.  So, substantial rights and interests are at stake.

The quantity disputes in this case cover a wide swath of time and they have many forms and facets.  The court has concluded that they necessitate a transaction-by-transaction review of the sources for the PSR's drug quantity finding.  But before the court can reach those granular issues, it first must explain the methodology used by the PSR (part A) and then identify some of the legal principles (part B) controlling this analysis.

### A.  The PSR's Drug Quantity Calculation and Supplemental Organizing Chart

Mr. Bush's PSR deemed Mr. Bush accountable for 3,214.88 grams of heroin, "representing his own drug sales and the drug sales of his co-defendants, which are considered under Guidelines § 1B1.3(a)(1)(B), as the heroin sold by co-defendants was sourced from Bush, Jr. at 823 Parallel."  Doc. 277 (PSR) at ¶ 116.  Based on this quantity calculation, the PSR concludes that Mr. Bush's Base Offense Level is 32, *i.e.*, at least three but less than 10 kilograms of heroin.  *Id.* at ¶ 129 (citing § 2D1.1(a)(5) and (c)(4)).  While the PSR contained considerable detail about its drug quantity calculation, the court concluded that a chart would assist the court's work to decide defendant's many objections on the issue.  So, the court directed the PSR's author to prepare a chart summarizing the specific sources of drug quantity it had used to reach its conclusion about Mr. Bush's "personally allocable share" and his Base Offense Level.  The author prepared the chart and the court marked it as Court Exhibit 1 during the December 21, 2020 hearing.  This Exhibit 1 is attached to this Memorandum and Order and, for simplicity, this Order refers to it as "The Drug Chart."[1]

---

[1]      The Drug Chart discloses a minor correction to the total drug quantity calculation.  Instead of the 3,214 grams found by the PSR, the Drug Chart calculates Mr. Bush's personally allocable share as 3,187

### B.  Governing Legal Principles

Sentencing courts "should begin all sentencing proceedings by correctly calculating the applicable guidelines range . . . [T]he Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citing *Rita v. United States*, 551 U.S. 338, 347-48 (2007)).  In drug cases, this starting point requires the court to determine the personally accountable "quantities of contraband with which [the defendant] was *directly involved* and, in the case of jointly undertaken criminal activity, all *reasonably foreseeable* quantities of contraband that were within the scope of the criminal activity that he jointly undertook." *United States v. Lauder*, 409 F.3d 1254, 1267 (10th Cir. 2005) (emphasis in original).  This work functions as a fundamental step of sentencing because the court must determine the base offense level, U.S. SENTENCING GUIDELINE MANUAL § 1B1.1(a)(2), and the drug quantity finding often drives the base offense level.  *See id.* at §2D1.1(a)(5) ("the offense level specified in The Drug Quantity Table set forth in subsection (c)" of § 2D1.1 produces the applicable Base Offense Level, with certain noted exceptions).  Where, as here, the offenses of conviction involve "both a substantive drug offense and an attempt or conspiracy (e.g., sale of five grams of heroin and an attempt to sell an additional ten grams of heroin) the total quantity involved shall be aggregated to determine the scale of the offense." *Id*. at § 2D1.1 cmt. n.5.

Where no drugs are seized "or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." *Id.*; *see also United States v. Ruiz-Castro*, 92 F.3d 1519, 1534 (10th Cir. 1996) (*overruled on other grounds by United States v. Flowers*, 464 F.3d 1127, 1130 n.1 (10th Cir. 2006)).  When estimating the approximate

---

grams.  *See* Court Exhibit 1 at n.1.  This correction does not affect the PSR's determination of the Base Offense Level since the total still exceeds three kilograms.  *See* GUIDELINE MANUAL § 2D1.1(C)(4).

quantity of unseized drugs, the court must use information that bears "some basis of support in the facts of the particular case and bears sufficient indicia of reliability." *United States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir. 2005) (citation and internal quotation marks omitted). Our Circuit has approved use of drug proxies to estimate the quantity of the controlled substance. For example, in *United States v. Rios*, 22 F.3d 1024, 1027 (1994), the Tenth Circuit joined other Circuits and held that district courts properly may convert "sums of cash" to drug equivalents "so long as the quantities are determined to be relevant quantities under § 1B1.3." But when there are "a number of plausible estimates" and none of them "is more likely than not the correct quantity, a court must err on the side of caution." *United States v. Ortiz*, 993 F.2d 204, 208 (10th Cir. 1993); *see also United States v. Aragon*, 922 F.3d 1102, 1111 (10th Cir. 2019).

The Guidelines range "is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction." *United States v. Patton*, 927 F.3d 1087, 1091 (10th Cir. 2019) (citing *Witte v. United States*, 515 U.S. 389, 393 (1995)). Guidelines § 1B1.3(a)(1) "defines a defendant's relevant conduct in two ways, either or both of which may apply in a given case." *Id*. First, and simplest, a defendant's relevant conduct includes his own actions and omissions. As the Guidelines express it, a defendant is responsible for all actions and omissions that "he committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused . . . ." *Id.* (quoting §1B1.3(a)(1)(A)). In addition, the defendant is responsible for "jointly undertaken criminal activity." This joint action prong of sentencing responsibility makes defendant responsible for "all acts and omissions of others" that qualify as jointly undertaken criminal activity so long as the acts "occurred during the commission of the offense of conviction[,]", in

preparation for [it], "or in the course of attempting to avoid detection or responsibility for that offense[.]" *Id.* (quoting § 1B1.3(a)).

To decide whether a defendant is responsible for acts by others as part of jointly undertaken criminal activity, the court must answer three distinct questions. First, were the acts performed by the other person within the scope of defendant's jointly undertaken criminal activity? Second, were the other person's actions taken "in furtherance of that criminal activity[?]" And last, were the acts of the other person reasonably foreseeable in connection with that criminal activity? *Patton*, 927 F.3d at 1091 (quoting § 1B1.3(a)(1)(B)). But before it can answer these three questions, "the court must first determine the scope of the criminal activity that the particular defendant agreed to jointly undertake." *Id.* at 1094 (quoting *United States v. McClatchey*, 316 F.3d 1122, 1128 (10th Cir. 2003)). Answering this initial question about scope is critical because "a defendant's accountability only extends to the criminal activity that he agreed to undertake." *United States v. Dazey*, 403 F.3d 1147, 1176 (10th Cir. 2005).[2]

When determining the offense level, the court may consider drug quantities not encompassed by an offense of conviction. *See United States v. Damato*, 672 F.3d 832 (10th Cir. 2012). *Damato* exemplifies this principle. There, the Circuit affirmed the sentencing court's use of an attempted purchase of marijuana in 1990 to determine the defendant's drug quantity for a conspiracy conviction that, as charged, began in December 2003. *Id.* at 839, 849. This approach is permissible because of two extenders embraced by the Guidelines' concept of relevant conduct. Specifically, when determining the offense level, § 1B1.3(a)(2) directs courts to

---

[2]     Proving the scope of the criminal agreement does not require explicit contract rudiments such as a formal offer and acceptance. Instead, when deciding "the scope of the specific conduct and objectives embraced by the defendant's agreement . . . the court may consider any explicit agreement or *implicit agreement fairly inferred from the conduct* of the defendant and others." U.S. SENTENCING GUIDELINE MANUAL § 1B1.3 cmt. n.3(B) (emphasis added).

consider "all acts and omissions" that (1) qualify as relevant conduct if, among others, (2) it is "part of the same course of conduct or common scheme or plan as the offense of conviction." *Damato*, 672 F.3d at 839 (quoting § 1B1.3(a)(2)). *See also United States v. Garcia*, 946 F.3d 1191, 1203 (10th Cir. 2020). Our Circuit distinguishes between course of conduct and common scheme by applying the following test: Conduct qualifies as *same course of conduct* if it is "sufficiently connected or related . . . to warrant the conclusion that [the conduct and the offense of conviction are] part of a single episode, spree, or ongoing series of offenses." *Id.* (quoting application note 9(B), (current version at cmt. n.5(B)(ii))). Alternatively, uncharged conduct qualifies "under the *common scheme or plan* prong if it is 'substantially connected to [the offense of conviction] by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi.'" *Damato*, 672 F.3d at 845 (quoting application note 9(A) and current version at cmt. n.5(B)(i)) (emphasis added).[3]

Finally, when deciding the facts that control sentencing, the court "may accept any undisputed portion of the presentence report as a finding of fact[.]" Fed. R. Crim. P. 32(i)(3)(A). But when the defendant disputes a fact in the presentence report, and it is "important to the sentencing determination . . . the parties shall be given an adequate opportunity to present information to the court regarding that factor." U.S. SENTENCING GUIDELINE MANUAL § 6A1.3. Sometimes, "statements of counsel or affidavits of witnesses" adequately may resolve the factual dispute. *Id.* ("Commentary"). But in other cases, an evidentiary hearing may provide "the only reliable way to resolve disputed issues." *Id.* (first citing *United States v. Jimenez Martinez*, 83

---

[3]     The Guidelines impose an additional requirement before same course of conduct or common scheme or plan may apply. Section 1B1.3(a)(2) provides that these extended forms of relevant conduct apply "solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts." *Id.*; *see also Damato*, 672 F.3d at 839. This requirement is satisfied here because the PSR grouped the offenses of conviction under this provision, among others. *See* Doc. 277 at ¶ 128. Neither party challenged the PSR's conclusion about grouping.

F.3d 488, 494–95 (1st Cir. 1996); then citing *United States v. Roberts*, 14 F.3d 502, 521 (10th Cir. 1993) (further citation omitted)).  The Federal Rules of Evidence don't apply in evidentiary hearings during the sentencing phase of a case.  *United States v. Browning*, 61 F.3d 752, 755 (10th Cir. 1995).  But defendants possess a right "not to be sentenced on the basis of materially incorrect information, and [courts have] required hearsay statements to possess some minimal indicia of reliability before being used at sentencing[.]"  *Id.*  The reasonable doubt standard does not apply to disputed facts at sentencing.  Instead, the "quantum of proof necessary to support a drug quantity determination is a preponderance of the evidence."  *Ruiz-Castro*, 92 F.3d at 1534.

### C.  Rulings on Defendant's Drug Quantity Challenges

The Drug Chart's summary divides the drug quantity calculation into four parts:  (1) "Controlled Buys of Heroin" (page 1); (2) "Confidential Source/Proffer Information/Post-Arrest Statements" (page 2); (3) "Seized from Defendants" (top of page 3); and (4) "Sale Quantities associated with video surveillance at 823 Parallel" (middle of page 3).[4]  This Order takes up the various transactions in the same sequence as The Drug Chart.  For simplicity, the court's discussion of the drug quantity issue uses the same labels as The Drug Chart.

The Drug Chart also references an alternative methodology called "Casino Analysis."  *Id.* (bottom of page 3).  While the PSR didn't use this methodology to determine Mr. Bush's drug quantity, the government advances it now as an alternative and, in its view, simpler means to decide the quantity question.  In short form, the Casino Analysis relies on funds gambled by Mr. Bush and one of his co-defendants at a nearby casino.  The government argues that the trial

---

[4]     This Order frequently refers to a house at 823 Parallel Avenue (and not the more heavily travelled Parallel Parkway) in Kansas City, Kansas.  Mr. Bush's father, George Bush, Sr., lived in this house.  The trial evidence established that defendant spent considerable time in this residence but, he didn't live there full-time.  It also showed that defendant and others conducted substantial heroin activity inside this house and on an adjacent alley.

evidence (and supplemental evidence presented at sentencing) support a finding that the gambled funds represent heroin trafficking proceeds. Using the trial evidence about the street price for heroin, the government's analysis converts these gambling proceeds to a specific quantity of heroin. Ultimately, the court declines to adopt the government's methodology. But because the casino dollars analysis is useful in other respects, the court addresses it briefly at the end of its quantity analysis.

### 1. Subpart 1: "Controlled Buys of Heroin" by Undercover Officers

The first sources of heroin counted by the PSR against Mr. Bush's drug quantity are presented in ¶¶ 33–44, 47–50, and 52–53 of the PSR. *Compare* Doc. 277 (PSR) *with* The Drug Chart at 1. They consist of purchases made by law enforcement officers who, while working undercover, made controlled purchases from Mr. Bush and his co-conspirators. Mr. Bush doesn't object to the factual content of any of these paragraphs, *see* Doc. 277 (Addendum to PSR) at 42–44, so the court treats their factual assertions as undisputed. Fed. R. Crim. P. 32(i)(3)(A) (court "may accept any undisputed portion of the presentence report as a finding of fact . . ."). *See also United States v. Tindall*, 519 F.3d 1057, 1061–62 (10th Cir. 2008); *United States v. Showalter*, 569 F.3d 1150, 1160 (9th Cir. 2009) ("the district court may rely on undisputed statements in the PSR at sentencing") (quoting *United States v. Ameline*, 409 F.3d 1073, 1085–86 (9th Cir. 2005) (en banc)).

But while Mr. Bush doesn't dispute any facts asserted in these paragraphs, he plainly disputes the quantity conclusion that the PSR draws from them. *See* Doc. 277 at ¶¶ 268, 274. While it's not exactly clear that Mr. Bush objects to the PSR's use of each controlled purchase, the court, in the name of caution, assumes he does. And so, this Subpart 1 addresses each controlled purchase. It begins with the simplest ones—the transactions where Mr. Bush was

present.  The analysis then turns to the controlled buys where Mr. Bush was not present.  For those transactions, Mr. Bush argues that the PSR attributed these quantities to his personally allocable share even though it failed to make the requisite findings for "jointly undertaken criminal activity" under GUIDELINE MANUAL § 1B1.3 (a)(1)(B).  *See* Doc. 277 at ¶ 268.

### a.  Mr. Bush's own acts

The undisputed facts establish that Mr. Bush himself was present for five controlled sales of heroin.  *See* Doc. 277 at ¶¶ 33, 35, 39, 41 and 52.  Three of these purchases (¶¶ 33, 39 and 52) qualify as Mr. Bush's relevant conduct because of actions he undertook.  The others do not.  The court now explains its reasoning for these conclusions.

### (1) ¶ 33 (buy made on January 24, 2017)

The first of these purchases occurred on January 24, 2017, and it provides an important backdrop for all the transactions that followed it.  The trial testimony and the PSR establish that this purchase began when an informant advised an undercover narcotics detective that a man he knew as Freeway was selling black tar heroin.  The informant also provided a telephone number for Freeway, and the detective used the number to initiate communications with Freeway about buying three grams of heroin.  They negotiated a $300 price—$100 per gram.  They also agreed on a place and time to meet for the sale on January 24, 2017.  The detective arrived at the agreed location and waited beyond the agreed time.  Then, a white Chevy Tahoe arrived, and the detective's phone rang.  Freeway's number was calling.  The detective answered but no one responded—the caller just hung up.

Eventually, the driver of the white Tahoe—now parked near the detective's car—lowered his window and asked if the undercover detective was looking for someone.  He confirmed he was and then, the driver nodded—referring spatially to the part of the Tahoe behind the driver—

while saying, "He's in back."  The detective took the driver to mean that Freeway was sitting

inside the Tahoe somewhere behind the driver.  The detective didn't know the driver's identity

on the day of this first buy but later, he identified him as the defendant, George Bush, Jr.

After Mr. Bush had directed the detective to the back of the Tahoe, the detective got out

of his car and entered the middle row of the SUV.  He gave Freeway the $300 for 3.25 grams of

heroin.  The detective later identified Freeway as Mr. Bush's co-defendant, Albert Brown.  Also,

the detective later identified two other occupants in the Tahoe during this first controlled

purchase:  co-defendant Maurice Bluett (known as Boogie) and Matthew Bush.  Mr. Bluett

displayed a Glock semiautomatic pistol as the detective entered the Tahoe.  The detective,

fearing the men were there to rob him, raised his hands in response to the firearm's display.  The

four men inside the Tahoe laughed at the detective's reaction, and the drug transaction then

proceeded.

Based on these undisputed facts in the PSR and the trial evidence, the court finds that the

sale of this heroin—3.25 grams—is properly attributable to Mr. Bush.  Two independent reasons

justify this conclusion.

First, the acts that Mr. Bush himself "committed, aided, abetted, . . . induced, procured or

willfully caused," GUIDELINE MANUAL § 1B1.3(a)(1)(A), "occurred during the commission of"

this sale of heroin.  Because his own acts aided and abetted this sale of illegal drugs, this quantity

qualifies as Mr. Bush's relevant conduct.  *Id*.  *See also id.* at § 1B1.3 cmt. n.4(B)(i) (explaining

that getaway driver is accountable for money taken in an armed robbery because driver aided and

abetted the robbery).  Second, alternatively, and even if Mr. Bush's own acts didn't make him

responsible for the sale, his conduct satisfies all three requirements for jointly undertaken

criminal activity taken in concert with Brown.  GUIDELINE MANUAL § 1B1.3(a)(1)(B).  Mr.

Bush's actions manifest that he undertook the sale of heroin "in concert with others," *i.e.*, Brown (Freeway) and Mr. Bluett (Boogie). And the acts by those two men establish that this sale of heroin was "within the scope of [their] jointly undertaken criminal activity," that Mr. Bush's actions were "in furtherance of that criminal activity," and this sale of heroin was "reasonably foreseeable in connection with that criminal activity." *Id.*

The court overrules any objection to including this sale of 3.25 grams on January 24, 2017, in defendant's drug quantity.

### (2) ¶ 39 (buy made on March 9, 2017)

The narcotics detective made his seventh controlled purchase on March 9, 2107. It also involved Mr. Bush directly. This transaction, the trial evidence established, followed what had become by then a familiar pattern. The undercover detective initiated the sale with a phone call to Brown and they agreed to meet at the same place where they had conducted the first sale. *See* Doc. 277 at ¶ 39. Mr. Bush and Bluett (and one other unidentified person) accompanied Brown there, *id.*, and the trial evidence established that they arrived in the same Chevy Tahoe used for the first three controlled purchases. Again, Mr. Bush drove the Tahoe to the agreed point of sale and Bluett brandished a Glock handgun while the detective completed the transaction inside the Tahoe. For the same reasons applied to the first purchase on January 24, 2017, the court finds that Mr. Bush aided and abetted the commission of this distribution offense on March 9, 2017, so it becomes his relevant conduct. GUIDELINE MANUAL § 1B1.3(a)(1)(A). And even if his role as driver didn't qualify the sale based on his own acts, the transaction qualifies as criminal activity jointly undertaken by Mr. Bush, Brown, and Bluett under § 1B1.3(a)(1)(B). The PSR properly attributed to Mr. Bush the 9.43 grams sold on March 9, 2017.

### (3) ¶ 52 (buy made on October 3, 2017)

The seventeenth (and next-to-last) controlled buy again involved Mr. Bush directly.  He sold 1.88 grams to a government cooperator on October 3, 2017.  This cooperator contacted Mr. Bush directly and arranged to buy three grams of heroin from him.  Doc. 277 at ¶ 52.  The cooperator, later identified as Charles Klepac, testified at trial.  His testimony established that he had conversed directly with Mr. Bush and they had agreed to meet for a heroin sale.  They did meet and Mr. Bush arranged for Klepac, as buyer, to receive 1.88 net grams of heroin in exchange for $300.  *Id.* (trial testimony supplied sales price).  At trial, Mr. Klepac testified that Mr. Bush also asked him to remove a tree stump from the yard at 823 Parallel—the house where Mr. Bush stored and dispensed heroin to customers.  The PSR properly attributed 1.88 grams of heroin to Mr. Bush on October 3, 2017 under GUIDELINE MANUAL § 1B1.3(a)(1)(A) as his own act.

### (4) ¶¶ 35 and 41 (buys made on February 1 and April 21, 2017)

The PSR establishes that Mr. Bush was present for two other controlled purchases undercover detectives made from Albert Brown:  one on February 1 (¶ 35) and the other on April 21, 2017 (¶ 41).  These undisputed paragraphs in the PSR establish that Mr. Bush "accompanied" Brown in the vehicle where he made both sales.  *Id.*

But the PSR does not establish that Mr. Bush "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused" any act or omission during these offenses, when Brown prepared for them, or while he was trying to avoid detection for them.  GUIDELINE MANUAL § 1B1.3(a).  Nor did the trial evidence establish such an act or omission.  Instead, the evidence established merely that Mr. Bush was present in the front passenger seat of the two vehicles involved in ¶¶ 35 and 41's purchases.  And, the government cites no authority

suggesting that a defendant's presence in a vehicle while another occupant completes a drug sale alone can justify responsibility under § 1B1.3(a)(1)(A).

In short, nothing in the PSR or the evidence qualifies these two sales based on defendant's acts (or omissions) under § 1B1.3(a)(1)(A).  This conclusion does not mean, however, that the two sales can't qualify under the jointly undertaken criminal activity analysis in § 1B1.3(a)(1)(B).  The court defers that analysis until the next section, which focuses on that prong of relevant conduct.

**b.  Responsibility for jointly undertaken criminal activity**

The federal Sentencing Guidelines recognize a second kind of relevant conduct.  Section 1B1.3(a)(1)(B) terms this kind of responsibility "jointly undertaken criminal activity"—JUCA for short.  This provision also supplies the three requirements of JUCA.

Here, the PSR concludes that 15 controlled sales made by Mr. Bush's co-defendants qualify as his relevant conduct because they constituted JUCA.  As overview, one co-defendant—Albert Brown—made 13 of the 15 sales.  Co-defendant Markelo Paden made the other two.  The court now addresses each sale made by these two individuals and decides whether they qualify as Mr. Bush's JUCA.

**(1) Sales made by Albert Brown**

Co-defendant Albert Brown made 13 of the 15 remaining controlled sales.  Page 1 of The Drug Chart identifies these sales, which it takes from ¶¶ 34, 35, 36, 37, 38, 40, 41, 42, 43, 44, 49, 50, and 53 of the PSR.  Mr. Bush hasn't objected to the facts recited in any of these paragraphs.  *See* Doc. 277 at 42–48 (reciting defendant's objections).  But Mr. Bush does object to the PSR's attributing Brown's drug sales to Mr. Bush.  *See id*. at ¶ 268 (objecting to Drug Summary calculation in ¶ 116 and arguing certain sales weren't part of Mr. Bush's JUCA).  The court

14

addresses each of these 13 sales, once again separating them into two groups:  ones made when Mr. Bush was present, and ones when he wasn't.

### (a) Sales by Brown while Mr. Bush was physically present

The PSR identifies two sales made to undercover detectives when Mr. Bush had accompanied Brown to the sale's agreed location.  *See* Doc. 277 at ¶ 35 (sale of 3.04 grams on February 1, 2017) and ¶ 41 (sale of 11.56 grams on April 21, 2017).  Credible trial testimony provided additional details about both sales.

The undercover detective initiated both heroin sales by placing a call to Albert Brown. The two agreed on quantity and price and agreed to meet at the same location used for the first undercover purchase, *i.e.*, the sale completed on January 24, 2017.  Both times, Mr. Bush sat in the front passenger seat of the car that Brown drove to the agreed location.  In both transactions, the detective handed the purchase money to Brown and Brown handed the heroin to the agent.

To decide whether Brown's actions qualify as Mr. Bush's relevant conduct, the court must apply the Guidelines' three-part test for JUCA.  Under this test, Mr. Bush is liable for Brown's sales of heroin if his actions were:  (i) within the scope of their JUCA; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity.  GUIDELINE MANUAL § 1B1.3(a)(1)(B).  The JUCA analysis also requires a time-oriented nexus applied broadly by the relevant conduct analysis.  This part of the standard asks whether the conduct of the other individual—here, Brown—"occurred *during* the commission of the offense of conviction, *in preparation for* that offense, or *in the course of attempting to avoid detection or responsibility* for that offense . . .."  § 1B1.3(a)(1)(B) (emphasis added).

The advisory comments to this Guidelines provision explain that, to "determine the defendant's accountability for the conduct of others . . . the court must first determine the scope of the criminal activity the particular defendant"—Mr. Bush—"agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement)." § 1B1.3 cmt. n3(B).  Section § 1B1.3's advisory guidance also advises that the court fairly may consider "any explicit agreement or any implicit agreement fairly inferred from the conduct of defendant and others."  *Id.*  Here, the trial evidence leaves no room for uncertainty whether Brown's acts distributing heroin fell within the scope of the JUCA that Brown and Mr. Bush agreed to undertake jointly.

The court finds that Mr. Bush and Brown agreed to acquire and resell heroin in concert with one another, focusing on distribution within the urban core of Kansas City, Kansas, and Kansas City, Missouri.  The court also finds that the objectives they agreed to pursue were the ones commonly associated with drug trafficking:  acquiring a controlled substance and reselling it for profit.  Their JUCA was not particularly selective about the portion of the heroin market they would pursue.  As did Brown, Mr. Bush personally participated in heroin sales and delivery on both sides of the Kansas/Missouri state line.  *See* Doc. 277 at ¶¶ 33 and 52.  Nor did the two men limit their sales to a quantity segment of the heroin product market.  And Mr. Bush personally participated in sales as small as two grams and sales as large as 11.5 grams.  *Id.* at ¶¶ 52 and 41.  *See also id.* at ¶¶ 34 & 49 (Brown's controlled sales ranged from 3.03 to 48.89 grams).

Also, the trial evidence implicitly manifested Mr. Bush's intention to join this criminal activity.  As example, Mr. Bush drove the Chevy Tahoe taking Brown to the agreed meeting point for heroin sales.  Once there Mr. Bush spoke the first words to the putative customer,

asking the undercover detective whether he was looking to meet someone.  After hearing that the officer was looking to meet someone, Mr. Bush nodded his head to direct the prospective buyer to Brown.  Mr. Bush then remained in the Tahoe's driver seat while Brown closed the drug sale in the row of seats directly behind him.  He would reprise some of this conduct in three later sales, riding with Brown to make the sales outlined in ¶¶ 35, 39, and 41 of the PSR (Doc. 277).

Later, video and audio devices planted inside the Kansas house where Mr. Bush based his heroin business repeatedly captured Mr. Bush's words.  They explicitly confirmed that he and Brown, among others, had agreed to sell heroin in a joint criminal undertaking.

The next prong of § 1B1.3's test for JUCA asks whether the conduct of others—here, Brown—"was in furtherance of the" JUCA.  § 1B1.3 cmt. n.3(C).  This factor is the easiest one to apply to Brown's acts.  In both sales established by ¶¶ 35 and 41, Brown sold heroin in exchange for money in the central urban core of Kansas City, Missouri.  This conduct fulfilled the core objective Mr. Bush and Brown had agreed to pursue.  The court thus finds that Brown's sale of heroin, as described in ¶¶ 35 and 41, was "in furtherance of" the JUCA.

The final component of the test asks whether the conduct by Brown "was reasonably foreseeable in connection with that criminal activity," GUIDELINE MANUAL § 1B1.3 cmt. n.3(D), *i.e.*, the criminal activity that Mr. Bush agreed to jointly undertake.  Comment 4(c) to this Guidelines provision offers several examples illustrating components of JUCA and two of them focus on the reasonably foreseeable element.  *See id*., examples (ii) and (vi) in cmt. n.4(c) to § 1B1.3.  Example (vi) applies most closely here.  It hypothesizes two street-level drug dealers.  The second one, identified as "Defendant Q," pools his resources and profits with four other street-level drug dealers.  Defendant Q, this example explains, has engaged in JUCA with the four other dealers and he thus is accountable under for the quantity of drugs that they sold.  *Id*.

This example fits the facts of this case.  Mr. Bush, the court finds from the trial evidence, pooled resources with Brown.  The evidence established that they pooled several resources used for heroin trafficking.  For example, both used the same vehicle—the Chevy Tahoe—to deliver drugs to customers.  It also established that the two conducted drug trafficking from the same house at 823 Parallel in Kansas City, Kansas—a house where Mr. Bush's father resided.  The court also finds that the two worked from a common inventory of heroin.  And they exchanged valuable trade information such as best practices for preparing heroin for sale.  In sum, based on the undisputed portions of the PSR and the credible trial evidence, the court finds that Brown's heroin sales were reasonably foreseeable in connection with the criminal activity that Mr. Bush agreed to undertake jointly with him.[5]

The government has carried its burden to establish all three components of JUCA test for Brown's February 1, 2017 (¶ 35) and April 21, 2017 (¶ 41) sales.  They thus are part of Mr. Bush's relevant conduct and the court finds that the PSR properly allocated these two sales as part of Mr. Bush's allocable drug quantity.  Also, the court overrules his objection to those findings by the PSR.

### (b) Other heroin sales by Brown

The PSR counts 11 other controlled sales made by Albert Brown to undercover officers as part of Mr. Bush's relevant conduct.  *See* Doc. 277 at 12–14.  Paragraphs 34, 36, 37, 38, 40, 42, 43, 44, 49, 50, and 53 of the PSR chronicle these sales and they also appear on page one of The Drug Chart.  As with Brown's other sales, Mr. Bush doesn't challenge any of the factual

---

[5]    The second aspect of Example (vi) assumes Defendant Q pooled his profits with the other drug dealers.  Here, the record is less explicit about whether Mr. Bush and Brown pooled their profits.  Arguably, some evidence suggests that they did.  Video surveillance showed Mr. Bush purposefully counting out large sums of money in front of his co-defendants.  While this evidence suggests that the participants pooled at least some of their heroin revenue and profits, it won't support a finding that they pooled profits.

content asserted in these paragraphs, but he again challenges the PSR's decision to include the 11 sales in Mr. Bush's relevant conduct.  Doc. 277 at 42–48 (¶ 268 asserts relevant conduct objection).

Brown made all 11 sales between January 24, 2017 (when the first controlled purchase occurred) and October 11, 2017.  The October date is important because the Title III devices placed inside the 823 Parallel residence began capturing video and audio around that time.  And these audio and video feeds yielded substantial evidence that Mr. Bush and Brown still were engaging in the above-described JUCA.  Indeed, the first sale Brown made to the undercover detective outside Mr. Bush's presence came just two days after the first sale, the one where Mr. Bush had directed the prospective buyer to Brown.  Also, Brown made all three sales to the buyer at precisely the same location where Mr. Bush and Brown had closed the first sale.  *Compare* Doc. 277 at ¶ 33 (location of original sale) *with id.* at ¶¶ 34, 37, and 40.  A fourth sale closed at an address within yards of that frequently used meeting point.  *Compare id.* at ¶¶ 33 and 42 (sales concluded at 1509 W. 12th Street and 1601 W. 12th Street).

The court finds that these 11 controlled purchases by Brown qualify as Mr. Bush's JUCA.  All 11 occurred within the scope of the JUCA that the two men agreed to pursue.  In each sale, Brown sold heroin for profit within the Kansas City urban core.  In that sense, he engaged in the same criminal activity that the two men had participated in together when they jointly made the first controlled sale on January 24, 2017.  *See* Doc. 277 at ¶ 33.  And, they were consistent with other drug trafficking activity that the two men pursued for much of 2017.  All 11 sales furthered this jointly undertaken criminal activity.  Finally, it was reasonably foreseeable to Mr. Bush that Brown—once introduced to this buyer—would continue making heroin sales to him.  Indeed, Mr. Bush knew that Brown had continued making heroin sales to this customer

because, later, he was present for some of them. *See id.* at ¶¶ 39 & 41 (trial evidence established buyer was same undercover officer).

In sum, the court finds that the heroin sales established in ¶¶ 34, 36, 37, 38, 40, 42, 43, 44, 49, 50 and 53 of the PSR are part of Mr. Bush's relevant conduct because each one qualifies as JUCA. The court thus overrules defendant's objection to that conclusion in ¶¶ 116–17 and holds that the PSR properly allocated the total quantity of these 11 sales to Mr. Bush's allocable drug quantity.

**(2) Controlled buys made from Markelo Paden**

In late July and early August 2017, a confidential source working with the Kansas City (Missouri) Police Department made two controlled buys from co-defendant Markelo Paden. Doc. 277 at ¶¶ 45–48. The confidential source completed both purchases at Paden's residence in Merriam, Kansas, a close-in suburb to Kansas City, Kansas. The sales, consisting of .44 grams and .66 grams, involved a total of $150. *Id.* The PSR allocates Mr. Paden's sales to Mr. Bush as part of his drug quantity. *See* The Drug Chart at 1.

Once again, defendant does not object to the PSR's report of the facts of these sales. Instead, he objects to the PSR's decision to treat both of Paden's sales as Mr. Bush's relevant conduct. The court agrees with Mr. Bush's objections. Nothing in the PSR or the evidence— including the evidence presented at sentencing—establishes that Mr. Paden made these sales as part of Mr. Bush's JUCA. The court thus sustains Mr. Bush's objection to the quantities taken from ¶¶ 47–48 of the PSR as part of his drug quantity.

**(c) Summary**

For the reasons explained above, the court finds that the PSR properly counted 16 of the 18 Controlled Buys of Heroin, as shown on page 1 of The Drug Chart, as Mr. Bush's relevant

conduct and allocable drug quantity.  It thus overrules his objections challenging those

conclusions in the PSR.  This conclusion produces a subtotal of 275.37 grams of heroin.[6]  The

court sustains, however, defendant's objection to the drug quantities in ¶¶ 47 and 48 of the PSR.

### 2.  Subpart (2):  Confidential Source/Proffer Information/Post-Arrest Statements

The second group of drug quantities attributed to Mr. Bush relies on statements by

confidential human sources, proffers by subjects of interest, and post-arrest statements by his co-

defendants.  Page 2 of The Drug Chart, with cross-references to specific paragraphs in the PSR,

identifies the source of relevant information and summarizes the corresponding quantities.  Mr.

Bush explicitly objects to some of these quantities (the ones derived from ¶¶ 21 and 30), *see*

Doc. 277 at ¶¶ 229 and 243, and he separately objects to the PSR's decision to include the 10

quantities in his drug weight.  *Id.* at ¶ 268.  Mr. Bush claims that the quantities aren't his own

conduct and the government hasn't proved that the amounts drawn from these transactions

qualify as his JUCA.  *Id.*

Part a of this Order, following, addresses some threshold legal issues.  Then, part b

individually addresses each of the 10 quantities and the 10 transactions that sponsor those

amounts.  Using a transaction-by-transaction approach, part b concludes that the PSR properly

attributed some of these quantities to Mr. Bush and, for others, the court sustains his objection.

### a.  Overarching legal issues

The guidance for the Sentencing Guidelines advises, "When there is no drug seizure or

the amount seized does not reflect the scale of the offense, the court shall approximate the

---

[6]     The PSR applied a total of 276.4878 grams taken from the controlled purchases shown on page 1 of The Drug Chart.  The two controlled purchases disallowed by the court's rulings eliminated .4419 grams (¶ 47) and .6694 grams (¶ 48) from the original total, reducing the total for the controlled purchases to 275.3765.

quantity of the controlled substance."  U.S. SENTENCING GUIDELINE MANUAL § 2D1.1 cmt. n.5.

Here, law enforcement authorities seized some but not all the drugs distributed by Mr. Bush and

his co-conspirators.  Law enforcement efforts seized the heroin that Mr. Bush and other members

of his alleged cohort sold to undercover officers in the controlled buys.

At trial, the court heard credible testimony that Mr. Bush and his co-conspirators

distributed heroin to 20 customers per day and, at times, more.  And, video captured by cameras

inside the 823 Parallel residence demonstrate Mr. Bush continued trafficking substantial

quantities of heroin not captured in the controlled purchases.  The totality of the circumstances

proved by this evidence convinces the court, and it now finds, that "the amount [of heroin] seized

does not reflect the scale of the offense."  *Id*.  Consequently, the court properly may

"approximate" Mr. Bush's allocable drug quantity.  *Id*.  *See also, Ruiz-Castro*, 92 F.3d at 1534

(when actual drugs not seized, court "may rely upon an estimate to establish defendant's

guideline offense level . . .") (overruled on unrelated grounds in *Flowers*, 464 F.3d at 1130 n.1).

This authority to approximate doesn't confer unlimited authority, however.  Instead, the

information used to calculate an estimate must have "some basis of support in the facts of the

particular case and bear [a] sufficient indicia of reliability."  *Dalton*, 409 F.3d at 1251 (internal

quotation marks omitted).  For example, a sentencing court may not base a sentence on the

average size of shipments by all traffickers of the relevant controlled substance.  *United States v.*

*Garcia*, 994 F.2d 1499, 1509 (10th Cir. 1993).  But the court properly may approximate quantity

based on testimony by a person with an admittedly compromised memory who acted in concert

with the defendant and other corroborating evidence about drug inputs.  *Dalton*, 409 F.3d at

1251.  Finally, when the sentencing court chooses "'between a number of plausible estimates . . .

none of which is more likely than not the correct quantity, a court must err on the side of caution.'" *Ortiz*, 993 F.2d at 208.  *See also Aragon*, 922 F.3d at 1111.

In several of his objections, Mr. Bush argues the PSR relied on statements by persons of interest who "did not testify at trial and that he had no opportunity to test the veracity of [the] statement through cross examination . . . ." *See, e.g.*, Doc. 277 at ¶ 229 (objecting to ¶ 21) and ¶ 243 (objecting to ¶ 30).  If defendant intended this language to assert a hearsay objection—and the court doesn't necessarily perceive that he did—the Federal Rules of Evidence don't apply at sentencing. *Browning*, 61 F.3d at 755.  The court is mindful, however, that "defendants have a due process right not to be sentenced on the basis of materially incorrect information, and thus has required hearsay statements to possess some minimal indicia of reliability before being used at sentencing." *Id.*  If Mr. Bush meant for this objection to assert a confrontation clause violation, the "Sixth Amendment's confrontation clause does not apply to a sentencing proceeding [and] the court may rely on the testimony or other statements of a witness even if that witness has not been subject to cross-examination by the defendant." *United States v. Carnell*, 972 F.3d 932, 945 (7th Cir. 2020) (quotation marks omitted).  Indeed, the Supreme Court has explained that sentencing courts "have long enjoyed discretion in the sort of information they may consider when setting an appropriate sentence." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017).

With these guiding principles in mind, the court turns to defendant's challenges to the PSR's use of the various quantities of heroin, as summarized in page 2 of The Drug Chart.

**b.   The ten sources of defendant's drug quantity summarized in page 2 of The Drug Chart**

**(1) ¶ 21:  SOI-2's proffer (counted as 226.8 grams)**

Law enforcement investigators interviewed "SOI-2"—a Source of Information—who provided "historical information" about Mr. Bush and co-defendant Maurice Bluett.  Doc. 277 at ¶ 21.  In this interview, SOI-2 admitted he had purchased "an ounce of heroin at a time" from Mr. Bush at $1,500 per ounce during 2015 and 2016.  *Id.*  While this source "did not buy consistently" from Mr. Bush, SOI-2 estimated "purchas[ing] a total of eight to ten ounces from Bush, Jr." *Id*.

Mr. Bush's objection doesn't object to ¶ 21's content—that is, he doesn't contest the proposition that SOI-2 made these statements to an investigator.  Instead, he objects to "consideration of this evidence" since he didn't ever get to cross-examine SOI-2.  *Id*. at ¶ 229. The court overrules Mr. Bush's hearsay and confrontation clause objection based on the legal authorities already cited.  *See supra* at 23 (citing *Browning* and *Carnell*).  But this ruling doesn't end the inquiry, for the court still must decide whether the information supporting this quantity— SOI-2—has a "sufficient indicia of reliability."  *United States v. Richards*, 27 F.3d 465, 468 (10th Cir. 1994).  *See also* GUIDELINE MANUAL § 6A1.3(a).

The court finds that SOI-2's statement possesses the requisite indicia of reliability.  It bases this finding on three primary factors.  *First*, the distribution quantity asserted by SOI-2 is generally consistent with quantities that Mr. Bush sold to undercover law enforcement buyers during controlled buys in 2017.  *Compare id*. at ¶ 21 and ¶ 41 (sale of approximately one-half ounce of heroin).  *Second*, SOI-2 described how Mr. Bush used lactose to cut the heroin he sold. This assertion comports with conversations captured by the Title III cameras placed inside the residence used by defendant for his heroin business.  But this evidence's value is somewhat

limited because the trial testimony also established that drug traffickers often use lactose to dilute the drugs they sell. *Third*, and most important, SOI-2 asserted that when he bought heroin from Mr. Bush, they met at a BP gas station near Fifth and Minnesota Streets in Kansas City, Kansas. Doc. 277 at ¶ 21. The trial evidence established that Mr. Bush met a government cooperator, Mr. Klepac, at this same location to conduct a heroin sale during 2017. Taken together, these circumstances warrant the finding that SOI-2's statement satisfies the "sufficient indicia of reliability" standard recognized in *Richards* and other cases.

Mr. Bush doesn't seem to challenge the PSR's conclusion that these sales to SOI-2, if accredited by the court, qualifies as his relevant conduct. Nor could he effectively. While SOI-2 provided information about purchases he made from Mr. Bush and Maurice Bluett—Boogie— the PSR only counts the quantity sold by Mr. Bush himself. *Compare* SOI-2's estimate of Mr. Bush selling 8 to 10 ounces to SOI-2, *with* The Drug Chart at 2 (calculating quantity attributed to Mr. Bush based on sales to SOI-2 as 226.8 grams, or 8 x 28.34 = 226.796 grams).[7] Nor does it matter that Mr. Bush made these sales to SOI-2 before the period of the conspiracy charged by the Superseding Indictment. Our Circuit has held in several cases that drug transactions occurring outside the scope of the convictions charged in the indictment can qualify as relevant conduct. *See Garcia*, 946 F.3d at 1202-03; *Damato*, 672 F.3d at 845 (holding under same course-of-conduct standard that 1990 drug sale properly could count as relevant conduct for charged conspiracy, which didn't begin until December 2003).

To decide whether uncharged conduct is part of the same course of conduct as the charge of conviction, the court must consider whether they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series

---

[7]     Mathematical formula adopted in Guidelines § 2D1.1 cmt. n.8(D) ("Measurement Conversion Table").

of events." *Garcia*, 946 F.3d at 1191 (quoting § 1B1.3 cmt. n.5 (B)(ii)).  The quoted Application Note identifies the factors guiding this "sufficiently connected or related" analysis.  They include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses."  § 1B1.3 cmt. n.5(B)(ii).  Mr. Bush's heroin sales to SOI-2 satisfy all three requirements.

*One*, the offenses are identical to one another.  Mr. Bush sold SOI-2 distribution quantity heroin in 2015 and 2016 just as he did to the undercover detective in 2017.  *Two*, the offenses involving SOI-2 occurred repeatedly during 2015 and 2016.  SOI-2 estimated he made eight to ten one-ounce heroin purchases from Mr. Bush during 2015 and 2016.  Doc. 277 at ¶ 21.  Mr. Bush continued this same conduct into 2017, making sale of distribution quantity heroin to the undercover detective during 2017.  *Third*, the time interval between the uncharged sales and the conduct supporting the conspiracy and distribution convictions is seamless. The sales to SOI-2 occurred in 2015 and 2016.  Mr. Bush's first sale to the undercover officer occurred in January 2017.

The court finds that Mr. Bush's sales to SOI-2 qualify as the same course of conduct manifested by his offense conduct for his current convictions.  His sales to SOI-2 thus qualify as Mr. Bush's relevant conduct even though they predated the time span of the charged conspiracy. The PSR properly attributed this 226.8 grams to Mr. Bush's relevant conduct.[8]

---

[8]     The court's decision to find that SOI-2's statements are reliable and qualify as relevant conduct are, in the end, of little consequence.  The court ultimately concludes that Mr. Bush's allocable drug quantity is more than 2.2. kilograms of heroin—well above the one-kilogram minimum quantity required by § 2D1.1(c)(5).

### (2) ¶ 30:  Jaryd Boone's two purchases from Bush (counted as 2 grams)

As the PSR puts it, "Investigators learned that a person identified as Jaryd Jonathan Boone purchased one gram of heroin on two occasions" from Mr. Bush.  Doc. 277 at ¶ 30.  The PSR allocates these two grams to Mr. Bush's drug weight.  Mr. Bush then directed Boone to contact Albert Brown for future heroin transactions.  *Id.*

Mr. Bush objects, making the same objection he made to ¶ 21, *i.e.*, Boone didn't testify so defendant couldn't cross-examine him.  *Id.* at ¶ 243.  The court overrules that objection for the same reasons already explained.  *See supra* at 23 (citing *Browning* and *Carnell*).  Mr. Bush also poses a separate, more focused objection in response to ¶ 117—one of two paragraphs in the PSR making drug quantity findings—and its reliance on the Boone transactions described in ¶ 30.  *See id.* at ¶ 272.  It notes, among other things, that ¶ 30 never provides a date for these sales and the PSR's assertion thus lacks sufficient reliability.  The court agrees and sustains defendant's objection.

The court agrees with Mr. Bush's argument that ¶ 30's assertions are too vague and incomplete to demonstrate that its information possesses the requisite "basis of support in the facts" of this case and it "bears sufficient indicia of reliability."  *Dalton*, 409 F.3d at 1251.  The PSR never explains who Mr. Boone is or how law enforcement officers connected him to this case.  Also, the way the PSR expresses the facts asserted by Boone concerns the court, *i.e.*, "Investigators learned that a person identified as Jaryd Jonathon Boone purchased one gram of heroin" twice from Mr. Bush.  Doc. 277 at ¶ 30.  How did investigators "learn" this information about Boone and defendant?  The PSR never explains how Boone's assertions reached investigators and the government's evidence never addressed Boone or the evident shortcomings in ¶ 30's assertions.  The court can't assess how many levels of hearsay are involved.

The court is mindful that the hearsay rule doesn't apply to the sentencing endeavor but here, the missing information affects the reliability of Boone's claims. Concluding that this portion of ¶ 30 lacks the requisite indicia of reliability, the court sustains Mr. Bush's objection to that portion of ¶ 30 and its contribution of two grams of heroin to Mr. Bush's allocable drug quantity.

### (3) ¶ 31:  Tyler Collins's purchases from Benjamin Mims (counted as 40 grams)

Next, the PSR asserts that investigators interviewed Tyler Collins in February 2018. Doc. 277 at ¶ 31 (shown on page 2 of The Drug Chart). Collins admitted he had purchased heroin from Benjamin Mims over some 10 months during 2017. The PSR then asserts, "A conservative estimate of the amount of heroin [that] Collins purchased from Mims was 40 grams." *Id.*

Mr. Bush does not object to the facts asserted in ¶ 31, so the court accepts its content as an undisputed finding of fact. Rule 32(i)(3)(A). *See also Showalter*, 569 F.3d at 1160. But Mr. Bush does object to the PSR's decision including these heroin purchases as his relevant conduct. Doc. 277 at ¶ 267–68. In summary form, the objection asserts that Mims's acts can't qualify as Mr. Bush's acts under the first prong of relevant conduct (§ 1B1.3(a)(1)(A)) and that the government hasn't established the requirements for the second prong, JUCA under § 1B1.3(a)(1)(B). After considering the undisputed portions of the PSR and the trial evidence, the court agrees with Mr. Bush and thus sustains his objection to his drug quantity based on Tyler Collins's purchases from Mims.

The collective evidence offered at trial and sentencing yields limited information about Mims's connections to Mr. Bush and his co-conspirators. It established that law enforcement agents—sometime after a controlled purchase on February 10, 2017—identified Mims as the

driver of the car that brought Albert Brown to that four-gram heroin sale. It also established that Mims spent time with Mr. Bush and his co-conspirators, among others, inside the residence at 823 Parallel. The government also proved that Mr. Bush discussed, in Mims's presence, customer complaints about his heroin and his relationships with heroin suppliers. Agent McElway credibly opined that among drug traffickers, this kind of information is "extremely private and sensitive" and drug dealers don't discuss these subjects "unless there's a large amount of trust and a large amount of investment with each other." Finally, the evidence established that Mims visited the house at 823 Parallel during the afternoon of November 4, 2017, spending time with Mr. Bush and others. Later that evening, Trooper Dax of the Kansas Highway Patrol stopped a car driven by Mims. He took Mims into custody on outstanding warrants and searched his car. The search discovered three grams of heroin and two grams of marijuana. This is a distributable quantity of heroin.

The PSR likewise contains limited information about Mims. The undisputed portions establish that: Mims lived in Lawrence, Kansas, frequented the house at 823 Parallel, and law enforcement had identified him as a heroin distributor (Doc. 277 at ¶ 14[9]); the vehicle that Brown and Bluett used to sell heroin on September 7, 2017—*see* Doc. 277 at ¶ 49—was parked in front of Mims's apartment in Lawrence on September 25, 2017 (*id.* at ¶ 51); that Mims conversed with Mr. Bush about his suppliers and their cutting of heroin (*id.* at ¶¶ 96 & 98); and that Mims was present when Mr. Bush discussed the weight of a substance inside a baggie (*id.* at ¶ 98).

---

[9]     Mr. Bush objected to a portion of ¶ 14 in the PSR and during the December 21 hearing, the court announced that his dispute with that paragraph didn't affect any sentencing decision and the court would not rely on that challenged content. *See* Fed. R. Crim. P. 32(i)(3)(B). But Mr. Bush's objection to ¶ 14 didn't reach the part of that paragraph relied on here. *See* Doc. 277 at ¶¶ 222-24.

More significantly, the PSR (undisputed portions) contains more details about November 4, 2017—the day when Trooper Dax arrested Mims after a car stop.  These undisputed portions establish that during the afternoon of November 4, 2017, Mims and Mr. Bush left the residence at 823 Parallel and entered the backyard together.  "Mims returned a short time later. Investigators observed and overheard Mims take a clear plastic bag with a brown object in about the size of a golf ball."  *Id.* at ¶ 99.  After massaging the substance and tying the baggie containing it, Mims placed it in his pocket.  *Id.*  When Mims left 823 Parallel, investigators followed him for a time and, as he was returning to his residence in Lawrence, they asked the Kansas Highway Patrol to conduct a traffic stop if it observed a traffic violation.  Trooper Dax made the stop and a post-arrest search located a hard, brown substance tied inside a baggie.  A lab test determined the substance was 2.49 net grams of heroin.  Also, Mims had about $5,000 of cash on his person, and he explained he had won the money at a casino the night before.  *Id.* at ¶ 100.  Based on the evidence and undisputed entries from the PSR, the court finds that a preponderance of the evidence establishes Mims acquired the heroin (2.49 grams) found inside his car when arrested on November 4, 2017, from someone at 823 Parallel.  To say the least, Mr. Bush was an active participant in trafficking activity conducted at that location.

On this limited information, the court must decide whether the sentencing record, considered as a whole, supports the PSR's conclusion that Mims's heroin sales to Tyler Collins—summarized in ¶ 31—qualifies as Mr. Bush's relevant conduct.  As recited above, the court decides this question by applying Guidelines § 1B1.3(a)(1).  The sentencing record contains too little information to justify including Mims's sales to Collins as Mr. Bush's relevant conduct.

Mims's sales don't qualify as relevant conduct under § 1B1.3(a)(1)(A).  They can't.
Nothing suggests that Mr. Bush's own acts or omissions committed (or even aided or abetted)
Mims's heroin sales to Collins.  This conclusion leaves the JUCA alternative in § 1B1.3(a)(1)(B).
This analysis relies on the three requisites specified in that provision.  Too little is known about
Mims's sales to Collins to conclude that they occurred "within the scope of the jointly
undertaken criminal activity."  § 1B1.3(a)(1)(B)(i).  The sentencing record contains no
information where those sales occurred.  This negates a finding that they acted within the scope
of the JUCA Mr. Bush agreed to undertake, *i.e.*, to distribute heroin for profit in the greater
Kansas City metropolitan area.  And even if the government cured the geography problem, the
government has failed to provide any basis for a finding that Mims's sales to Collins furthered
the criminal activity that Mr. Bush purportedly had agreed to undertake jointly with Mims.

Perhaps Mr. Bush supplied the heroin that Mims distributed to Collins.  But nothing in
the sentencing record can support that proposition.  Knowing that the heroin trafficking operation
operating in Mr. Bush's house supplied a relatively small amount of heroin to Mims on one
occasion is too little to make Mr. Bush responsible for Mims's sales of a significantly larger
amount of heroin.  For these reasons, the court sustains Mr. Bush's objection to including the
quantity sponsored by paragraph 30 in his relevant conduct.

### (4) ¶ 45[10]:  CS's purchases from Markelo Paden (counted as 75 grams)

In July 2017, investigators met with a confidential source (CS) identified by the Kansas
City, Missouri Police Department.  He told them that "Kilo" had served as his heroin supplier

---

[10]      Page 2 of The Drug Chart doesn't identify the PSR's paragraph serving as the source for this
fourth line on that page's summary of drug quantities.  The court has confirmed with the PSR's author,
however, that ¶ 45 serves as the source of the 75 grams attributed to Mr. Bush's drug quantity calculation
by this line on page 2 of The Drug Chart.

between September 2016 and late July 2017.  Doc. 277 at ¶ 45.  The CS also estimated that he had purchased a total of "75–300" grams from Kilo.  Investigators then identified Mr. Bush's co-defendant Markelo Paden as Kilo's real name.  The PSR, adhering to our Circuit's directive, "err[ed] on the side of caution" by assigning a drug quantity to this estimated quantity.  *United States v. Battle*, 706 F.3d 1313, 1320 (10th Cir. 2013).  That is, it quantified these transactions as involving 75 grams of heroin.  *See* page 2 of The Drug Chart (fourth transaction from top).

Mr. Bush does not object to the content of ¶ 45 and the court thus treats that content as an undisputed finding of fact.  Rule 32(i)(3)(A).  *See also Showalter*, 569 F.3d at 1160.  But he does object that the PSR included Paden's heroin sales in his drug quantity.  *See* Doc. 277 at ¶¶ 267–72 (objecting to PSR's drug quantity finding in ¶¶ 116 and 117).  Responding to this objection, the government asserted that Paden "was another member of [Mr. Bush's] conspiracy [but] the Government chose not to introduce at trial evidence of Paden's involvement in the conspiracy . . . ."  Doc. 281 at 53, n.11.

The CS referenced in ¶ 45 never asserted any personal involvement by Mr. Bush in his purchases from Paden.  So, for Paden's sales to qualify as Mr. Bush's relevant conduct, the sentencing record must justify the conclusion that those sales qualify under the JUCA prong of relevant conduct.

Here is the sum of what is known about Paden based on undisputed aspects of the PSR: he was Mr. Bush's co-defendant (Doc. 277 at 2); Paden pleaded guilty to distributing heroin (*id.* at ¶ 11); law enforcement officers identified Paden as a person who was distributing heroin and acquiring his heroin from Mr. Bush (Doc. 277 at ¶ 14[11]); Paden frequented the house at 823 Parallel (though he stopped coming there sometime before August 2017) and he sold "about an

---

[11]   *See* footnote 9, above.  Here, as there, Mr. Bush's objection did not challenge the portion of ¶ 14 involving Mims.

ounce of heroin per day" (*id.* at ¶ 27); CS-1 believed Paden and Albert Brown had some sort of feud with one another (*id.*); Blake Assel told FBI agents that Paden was his "primary source of supply" of heroin from April 2016 until Paden "went to jail" around July 2017 (*id.* at ¶ 29); toll analysis of the participants' phones revealed 239 contacts between Paden and Albert Brown from mid-December 2016 to mid-July 2017 (*id.* at ¶ 32); local law enforcement officers arranged a controlled buy in late July 2017 and the confidential source purchased .57 grams of heroin from Paden at his apartment in Merriam, Kansas (*id.* at ¶¶ 46–47); the same confidential source made another controlled purchase (.66 grams) from Paden in early August 2017, when Paden "pinched off [that] smaller quantity of heroin from a softball size quantity" of heroin (*id.* at ¶ 48); Paden commenced a term of incarceration in a local county jail on August 10, 2017, and thus "he was never observed on [the] video" captured in the 823 Parallel house since surveillance there began after that date (*id.*); and Paden's PSR deemed him accountable for about 286 grams of heroin in his distribution convictions (*id.* at ¶ 119).

The government concedes that the trial evidence didn't establish that Paden was Mr. Bush's co-conspirator. And the government's sentencing evidence didn't enhance the government's efforts to connect Paden to Mr. Bush. These omissions leave the undisputed portions of the PSR. After reviewing them, the court finds the PSR is inadequate to establish that Paden's heroin activity qualifies as part of Mr. Bush's JUCA. The closest the PSR comes to linking Paden to Mr. Bush is the undisputed content of ¶ 27. There, the PSR finds that Paden "used to frequent 823 Parallel and sell about an ounce of heroin per day." Doc. 277 at ¶ 27. This finding links Paden and Mr. Bush geographically and, also, establishes that Paden trafficked in heroin at some unidentified point. But that nexus, without more, can't establish all three requisites of JUCA. And there is no more. The court thus sustains Mr. Bush's objection to the

75 grams attributed to Mr. Bush's relevant conduct based on the Paden transactions in ¶ 45 of the PSR.

### (5) ¶ 29:  Blake Assel's purchases from Paden from April 2016 until July 2017 (counted as 210 grams)

Paragraph 29 of the PSR serves as the source for two drug quantities attributed to Mr. Bush.  The first quantity comes from the fifth line of page two of The Drug Chart, attributing 210 grams of heroin to Mr. Bush.  The PSR derives this quantity from Blake Assel's statements during an interview with FBI agents.[12]

In this interview, Assel asserted that Markelo Paden was his primary source of heroin from late April 2016 until Paden went to jail in July 2017 or so.  According to Assel, he purchased about 15 grams each month during these 14 months.  The sales occurred at Paden's apartment in Johnson County, Kansas (the county adjacent to Mr. Bush's drug operations in Wyandotte County, Kansas and part of the Greater Kansas City Metropolitan Area).  Doc. 277 at ¶ 29.

As with other aspects of the PSR, Mr. Bush doesn't object to the factual content of ¶ 29, but he does object to including it in his allocable drug quantity findings in ¶¶ 116–17.  *See* Doc. 266–72.  Mr. Assel's interview does not assert any personal involvement by Mr. Bush in his heroin acquisition from Paden.  So, once again, if this quantity is to qualify as Mr. Bush's relevant conduct, it must rely on the JUCA prong of relevant conduct.  The court already has discussed the scarcity of evidence about Paden during Mr. Bush's trial and the sentencing evidence.  *See supra* at 20.  Indeed, the government concedes that it chose not to present evidence it claims it has about Paden's alleged role in the conspiracy.  Doc. 281 at 53, n.11.  The

---

[12] The other quantity derived from ¶ 29 of the PSR appears on the seventh line of page 2 of The Drug Charge, *i.e.*, 180 grams involving Blake Assel.

court already has concluded that the PSR provides no basis for Paden's heroin activity to qualify as Mr. Bush's JUCA.  These conclusions apply with equal force to Assel's assertions about Paden's sales to him.  The court thus sustains Mr. Bush's objections to the 210 grams of drug quantity based on this aspect of ¶ 29 of the PSR.

### (6) ¶ 20:  SOI-1's purchases from "Freeway," late December 2016 to January 2017 (counted as 63 grams)

Paragraph 20 of the PSR serves as the next source for the PSR's drug quantity calculation.  SOI-1 reportedly purchased heroin "roughly 12 to 15 times from 'Freeway.'"  Doc. 277 at ¶ 20.  SOI-1 reported that he made these purchases over the course of a month beginning in late December 2016 through late January 2017.  SOI-1 also purchased a "ball"—3.5 grams of heroin—for $300 from Freeway "numerous times."  He then began purchasing "a seven"—7 grams of heroin—for $550.  SOI-1 stated he had purchased "roughly" 63 grams of heroin from Freeway in one month, buying about every other day.  SOI-I also asserted knowing that Freeway "always had at least two ounces of heroin on him, along with several thousand dollars' worth" of currency.  *Id.*

Mr. Bush hasn't objected to the PSR's assertion that SOI-1 made these statements.  But he does object to the PSR's decision to accredit them and include them as Mr. Bush's relevant conduct under the JUCA analysis.  *See* Doc. 277 at ¶¶ 267–72.

The court finds that SOI-1's statements have more than "some basis of support in the facts of the particular case and bears sufficient indicia of reliability."  *Dalton*, 409 F.3d at 1251.  The characteristics of the purchases asserted by SOI-1 correspond closely to known heroin trafficking activity involving Mr. Bush and Brown (Freeway) during this period.  SOI-1's purchases from Brown occurred between late December 2016 and late January 2017 and the record easily establishes that Mr. Bush and Brown jointly engaged in heroin trafficking during

this period.  The first controlled buy occurred on January 24, 2017, and that sale closed after Mr.

Bush drove Brown to the agreed meeting place, initiated contact with the undercover detective,

and directed him to Brown.  Brown then concluded the sale in the back seat of the Chevy Tahoe

that Mr. Bush was driving.  *See supra* at 15-17.  The quantities of SOI-1's purchases also

comport with quantities of undisputed sales Mr. Bush and Brown made to undercover officers.

SOI-1 began by buying three grams from Brown—the same quantity of the first three purchases

made by the undercover detective.

This conclusion leaves the dispositive question:  Were Brown's sales to SOI-1 part of Mr.

Bush's JUCA?  In large measure, the court already has decided this question.  The court

concluded that the two men had agreed to distribute heroin in concert with one another

throughout the greater Kansas City metropolitan area.  Their agreement applied to all of 2017,

among other time periods.  It thus was reasonably foreseeable that Brown would sell heroin to

other customers even though Mr. Bush wasn't physically present for those other sales.  The court

finds that Brown's sales to SOI-1 during late December 2016 and January 2017 properly

constitute Mr. Bush's JUCA and those sales thus qualify as Mr. Bush's relevant conduct.  The

court overrules defendant's objection to these 63 grams in his personally allocable drug quantity,

as shown on the sixth line of page 2 of The Drug Chart.  They are part of his relevant conduct.

### (7) ¶ 29:  Blake Assel's interview statements about purchase from Albert Brown (counted as 180 grams)

The next line of The Drug Chart attributes 180 grams to Mr. Bush's drug quantity.  It

bases this drug quantity on paragraph 29 of the PSR which, in turn, is based on Blake Assel's

interview with the FBI.  In that interview, Assel asserted he had purchased some heroin from

Paden in July and August 2017, but "was sent to" Albert Brown "when Paden went to jail."

Doc. 277 at ¶ 29.  Assel reported he had purchased a total of 180–200 grams from Brown between November 2016 and November 2017, "with a few months break."  *Id.*

Mr. Bush doesn't object to paragraph 29's assertion that Assel made these statements to the FBI.  But he does challenge the PSR's decision to include these purchases within Mr. Bush's relevant conduct.  *See id.* at ¶¶ 267–72.  The court understands Mr. Bush's objection to challenge both the reliability of Assel's assertions and the determination that these sales were part of Mr. Bush's relevant conduct.  Neither challenge is persuasive and, based on the findings recited below, the court overrules them.

First, the court finds Assel's assertions sufficiently reliable and it thus accredits them. Unchallenged evidence at trial established that Mr. Bush and Brown engaged in heroin trafficking throughout 2017.  This evidence included unchallenged testimony by undercover law enforcement officers who had heroin-trafficking contact with both men over the course of that year.  The trial evidence also included video showing the two men engaged in heroin preparation and sales inside 823 Parallel.  Testimony by a cooperating witness who was present inside that house—he lived there for a while—persuasively established Mr. Bush and Brown engaged in daily drug activity.  Also, Assel's statements about heroin quantities purchased from Brown comport with his estimates of other heroin purchases.  Assel asserted that he acquired "15 grams of heroin per month for 14 months from [Markelo] Paden."  Doc. 277 at ¶ 29.  But when Paden went to jail, an unidentified person redirected him to Albert Brown for his heroin.  Brown then sold Assel "between 180-200 grams" during the period "from November 2016 to November 2017."  *Id.*  Using the low end of this range of purchases (180 grams) and dividing that total quantity by 12 months, Assel's purchases from Brown average 15 grams per month—the same

quantity he had purchased monthly from Paden.  Assel's statements are fully consistent with this other evidence and the court finds them sufficiently reliable.

Second, the court finds that Brown's heroin sales to Assel constitute part of the JUCA undertaken by Mr. Bush and Brown.  As the court already has discussed, *see* pages 19-20, above, the court finds Brown's heroin sales were within the scope of the criminal activity that the two men jointly undertook.  Brown's sales to Assel furthered the purposes of his JUCA with Mr. Bush.  And, it was reasonably foreseeable to Mr. Bush that Brown would sell heroin to other buyers while Mr. Bush was not present with him.  These sales to Assel satisfy all three touchstones of the test for JUCA and thus, the court concludes, the PSR properly counted the Assel quantity of 180 grams, (based on the conservative, lower rung of his estimate) as part of Mr. Bush's drug quantity.

### (8) ¶ 30:  Jaryd Boone's statements re purchase from Albert Brown (counted as 336 grams)

Paragraph 30 makes a second contribution to the PSR's drug quantity.  The Drug Chart, on the eighth line of page two, attributes 336 grams based on investigators "learn[ing] that a person identified as Jaryd Jonathan Boone" purchased about 14 grams of heroin per week from Brown for a six to eight-month period.  Doc. 277 at ¶ 30.  Using simple math— "six months x 4 weeks per month = 24 weeks x 14 grams per week = 336 grams"—the PSR attributes these 336 grams to Mr. Bush's allocable quantity.  *Id.*  Neither the PSR nor the evidence reflects when Boone made these purchases from Brown.

As recited earlier, Mr. Bush objects to including ¶ 30's quantity for reasons specified in ¶ 243.  *See supra* at 27.  The court's analysis of these objections and the reliability of Mr. Boone's statements is the same for this aspect of paragraph 30's quantity contribution as it was for the first quantity relying on ¶ 30.  So, for the same reasons, the court finds that the government has

failed to carry its burden and the court thus sustains Mr. Bush's objection to this second heroin quantity based on paragraph 30 of the PSR.

### (9) ¶ 109:  Isaiah Lewis's post-arrest statements (counted as 243.75 grams)

The PSR attributes 243.75 grams of heroin to Mr. Bush based on a post-arrest statement by co-defendant Isaiah Lewis.  The Drug Chart (line 9) specifies that this quantity is based on ¶ 109 of the PSR.  In his post-arrest statement following waiver of *Miranda* rights, Lewis described his heroin activities in several different ways.  First, he said he "sold one to three grams per day."  Doc. 277 at ¶ 109.  He then estimated that he "made $300 to $400 per day between June 2017 and November 2017."  *Id.*  Then, Lewis clarified he didn't sell heroin every day.  *Id.*  Lewis also estimated that he had "sold a total of 30 to 60 grams of heroin between June and November 2017."  *Id.*  He also referenced taking a "'ball' of heroin" from the refrigerator at 823 Parallel and accompanying others on drug deals because they "knew he was loyal and would 'have their backs.'"  *Id.*

Later, the PSR explains how it calculated the 243.75 grams derived from Lewis's statements.  *See id.* at ¶ 121.  This calculation began by calculating the period between June and November 2017 as 150 days, *i.e.*, five months x 30 days.  The PSR then estimated the typical size of Lewis's sales at 3.25 grams based on the controlled buy on January 24, 2017.  *See* Doc. 277 at ¶ 121 (apparently referencing the sale in ¶ 33).  Applying math to these assumptions produces 487.50 grams of heroin.  But, the PSR noted, Lewis noted he hadn't sold heroin every day during this 150-day period, so the PSR reduced the estimated number of days he sold heroin by one-half, reducing it to 75 days.  Changing this factor produced a reduced, estimated quantity of 243.75 grams for Lewis.

As with other sources of drug quantity, Mr. Bush doesn't object to the content of ¶ 109. The court thus treats its content, *i.e.*, that Lewis made these statements to law enforcement officers, as an undisputed statement of fact. Fed. R. Crim. P. 32(i)(3)(A) (court "may accept any undisputed portion of the presentence report as a finding of fact . . ."). *See also Tindall*, 519 F.3d at 1061–62. But he does appear to object to the PSR's attributing this quantity as part of Mr. Bush's relevant conduct. *See* Doc. 277 at ¶ 268. This objection appears to present two distinct challenges. First, does the PSR correctly attribute Lewis's heroin sales to Mr. Bush's allocable drug quantity? *Id.* And if it does, do the governing legal principles tolerate its quantity estimate of 243.75 grams? *Id.* at ¶ 267. The court takes up those questions now.

The court finds Lewis's statements that he had engaged in heroin trafficking are sufficiently reliable for use in the sentencing phase of this case. The PSR contains several undisputed provisions—now, undisputed facts—implicating Lewis in heroin trafficking activities at 823 Parallel. *See, e.g., id.* at ¶ 74 (Lewis entered 823 Parallel and handed Mr. Bush a "chunk" of apparent drugs, which the defendant then manipulated trying to break off a smaller piece while Lewis counted cash); *id.* at ¶ 75 (Brown exited the same house with Lewis and a bag of suspected heroin, Lewis reentered and "grabbed money and keys off the table and a pistol from the floor"); *id.* at ¶ 87[13] (Lewis entered kitchen at 823 Parallel, picked up a bag of suspected heroin and "tied up the bag" before handing it to Bluett); and *id.* at ¶ 98 (while inside house at 823 Parallel, Bluett tossed object to Lewis, telling him it was a gram, "but don't look like it," Lewis then asked Mr. Bush about a "nickel," and Mr. Bush explained how Lewis could use a dollar bill to calibrate a scale). These actions corroborate Lewis's statements after his arrest—all

---

[13]    Mr. Bush objected to a portion of ¶ 87, *i.e.*, "the visual weight estimate that appears in this paragraph." Doc. 277 at ¶ 259. The court addressed this objection by declaring that it would not rely on the challenged passage, which does not include the portion of ¶ 87 recited here.

contrary to his self-interest—that he had engaged in heroin trafficking.  *See id.* at ¶ 109.  The court thus finds Lewis's statements are sufficiently reliable and that no evidence contradicts them.

This leaves the issue whether Lewis's heroin trafficking qualifies as JUCA with Mr. Bush.  The court finds that the government has sustained its burden to satisfy all three parts of the analysis dictated by § 1B1.3(a)(1)(B) of the Sentencing Guidelines.  As discussed above, the court already has concluded that Mr. Bush agreed to undertake the criminal activity of distributing heroin in the Kansas City area jointly with others for profit.  *See* U.S. Sentencing Guideline Manual § 1B1.3 cmt. n.3(B).  To discern whether that criminal activity included Lewis, the court may consider any explicit agreement and any "implicit agreement fairly inferred from the conduct of the defendant and others."  *Id.*  The undisputed acts recited in this section, among others, provide enough support to conclude that Mr. Bush included Lewis in the list of people who, he had agreed, to involve in this joint criminal undertaking.  Lewis said he participated in heroin activities with Mr. Bush and the video evidence corroborated as much.  Naturally, Lewis's actions taken to distribute heroin furthered the purposes of that agreement.  And, the foreseeability element is easily satisfied.  Among other actions, Lewis returned heroin to the house at 823 Parallel and helped count cash in that house.  Lewis also admitted that he accompanied others on drug deals because they knew he was loyal to them.  In context, the available evidence supports a finding that the preponderance of evidence shows Lewis's heroin sales qualify as Mr. Bush's JUCA and thus his relevant conduct.  It thus overrules Mr. Bush's objection to the PSR's conclusion that Mr. Bush's relevant conduct includes Lewis's sales.

This conclusion leaves a quantity issue, which Mr. Bush's objection also appears to assert.  The source for this quantity of heroin—Isaiah Lewis's post-arrest statement—contained

several separate and materially different estimates about the quantity of Lewis's heroin sales. *See* Doc. 277 at ¶ 109 (Lewis said he sold "one to three grams of heroin per day," made a "couple hundred a day," that he made $300 to $400 per day, and estimating he had sold a total of 30 to 60 grams of heroin between June and November 2017). The math embedded in Lewis's statement simply won't tote. If Mr. Lewis sold one gram per day for six months, he sold 180 grams. If he sold three grams per day for six months, he sold 540 grams. And if he sold at a clip between one and three grams per day, he sold between 180 and 540 grams. But both ends of Mr. Lewis's estimated range far exceed the 30 to 60 grams that his statement also mentions.

The authority from our Circuit recognizes that sentencing courts may use estimates when law enforcement officers haven't seized the drugs at issue. *Ruiz-Castro*, 92 F.3d 1519 at (overruled on other grounds). This principle comports with guidance from the United States Sentencing Commission. *See* U.S. SENTENCING GUIDELINE MANUAL § 2D1.1 cmt. n.5. This authority comes with an important limitation, however. When choosing between a number of "plausible estimates of drug quantity," and none is more likely than not the correct quantity, the court "must err on the side of caution." *Ortiz*, 993 F.2d at 208. *See also United States v. Almedina*, 686 F.3d 1312, 1316 (11th Cir. 2012) (estimates, thought permitted, "may be based on fair, accurate, and conservative estimates").

Here, the government provides no basis for the court to conclude that any one of Lewis's estimates is "more likely than not the correct quantity," 27 F.3d at 469, so the court, consistent with Circuit precedent, chooses the cautious end of Lewis's various estimates. That quantity is 30 grams. Recognizing the possibility that this choice may understate Lewis's actual heroin activity in JUCA involving him and Mr. Bush, the court nonetheless sustains Mr. Bush's

quantity challenge in part. It reduces the contribution of Lewis's heroin sales to Mr. Bush's relevant conduct to 30 grams.

### (10) ¶ 112: Maurice Bluett's post-arrest statements (counted as 1,440 grams)

The last quantity supplied by Confidential Sources, Proffers or Post-Arrest Statements comes from co-defendant Maurice Bluett's post-arrest statement. Bluett's statement contributes 1,440 grams to the PSR's quantity conclusion. *See* The Drug Chart at p. 2 (last line). The PSR takes this quantity from ¶ 112 of the PSR. It reports that Bluett, after his arrest on April 17, 2018, waived his *Miranda* rights and participated in an interview with agents. Bluett then admitted "he had been selling heroin for roughly two years, selling about eight grams every two to three days." Doc. 277 at ¶ 112. The PSR also explained its methodology for quantifying Bluett's sales at 1,440 grams of heroin in ¶ 122. That is, the PSR used a "conservative time frame of 18 months," *id.*, or 540 days. The PSR then divided this conservative premise by another conservative premise, *i.e.*, assuming Bluett made heroin sales every *third* day for a total of 180 days of sales instead of *every* two days for 270 days, the PSR multiplied 180 days by eight—the number of grams that Bluett estimated he had sold "every two to three days." In short, the PSR used this formula: 540 days (equivalent of 1.5 years) ÷ 3 ("every two to three days") x 8 (grams) = 1,440 grams.

Mr. Bush doesn't challenge the content of paragraphs 112 or 122, but the court perceives that his objections challenge the PSR's decision to count Bluett's sales as part of his relevant conduct. *See* Doc. 277 at ¶¶ 268–69 (his objections to drug quantity in ¶ 116). These objections again implicate the relevant conduct analysis in § 1B1.3, *see* Doc. 277 at ¶ 268, and, separately, Mr. Bush asserts that Bluett "identified someone else other than Bush, Jr. as [his] supplier." *Id.* at ¶ 269. Neither objection is persuasive, and the court overrules them.

The PSR (its undisputed portions) and the trial evidence provide abundant evidence that Bluett and Mr. Bush engaged in jointly undertaken criminal activity with one another. Bluett was a regular accomplice on heroin sales calls. *See, e.g.*, Doc. 277 at ¶ 33 (Bluett accompanied Mr. Bush and Albert Brown during first controlled purchase by undercover detective on January 24, 2017, and brandished a firearm during it), ¶ 34 (two days later Bluett accompanied Brown to second controlled purchase by same undercover detective and Bluett accepted the money for the heroin, packaged it, and again brandished his weapon during this sale), ¶ 38 (on March 1, 2107, Bluett again accompanied Brown to sale of 6.74 grams), ¶ 39 (on March 9, 2017, Bluett accompanied Mr. Bush and Albert Brown during sale of 9.43 grams heroin and explicitly showcased his firearm, *i.e.*, "I got that gun, look, look, I got that guy . . . ."), & ¶ 49 (Bluett accompanied Brown to sell one ounce of heroin and the two men shared a firearm during the sale). But Bluett didn't confine his role in this heroin enterprise to sales calls.

For instance, a confidential source informed investigators that Mr. Bush, Albert Brown, Bluett and others were selling a "hard brown substance . . . on a daily basis" from the residence at 823 Parallel. *Id.* at ¶ 25.[14] The same confidential source asserted he saw "heroin being cooked on the kitchen stove and cut with brown sugar and an unknown white powder" at this residence and saw it distributed from there. This source also reported that he saw Mr. Bush, Brown and Bluett "allocate the heroin for sale and place some of the heroin in the kitchen freezer." *Id.* at ¶ 24. Photographs introduced as evidence during trial and at the sentencing hearing confirmed many of these operational details. Using the access permitted by the Title III cameras placed in the residence, officers observed Bluett comment about the weight of heroin and predict a buyer's response to its quality. *Id.* at ¶ 91 (Inside the residence at 823 Parallel,

---

[14]     Mr. Bush objects to the "lack of specificity" of some aspects of ¶ 25, but he does not challenge the portion of it relied on in this Order.

Rodney Bush announced the weight of a chunk of heroin at .9 and then asked if "he" was going to say something.  Bluett answered, "I know he gonna say something about it."  Mr. Bush then advised a third man how to make the heroin softer and warned against adding lactose because it would harden the heroin.)  Mr. Bush and Bluett worked together to help a different participant calibrate a scale used for weighing heroin.  *Id.* at ¶ 98.  And finally, on November 6, 2017, when someone fired at the residence at 823 Parallel while Mr. Bush and Bluett were there, Bluett responded by arming himself with a handgun and an AK-47.  *Id.* at ¶ 140.  A few hours later, Mr. Bush and Bluett left that residence in Mr. Bush's car while "carrying multiple firearms."  *Id.* at ¶ 142.

These undisputed facts and the government's corroborating evidence establishes all three prerequisites for Bluett's criminal activity to qualify as criminal activity he jointly undertook with Mr. Bush.  The court "fairly infer[s]" from Bluett's actions that he implicitly agreed to join Mr. Bush's efforts to distribute heroin for profit in the Kansas City metropolitan area.  *See* U.S. SENTENCING GUIDELINE MANUAL § 1B1.3 cmt. n.3(B).  Bluett's many actions, often taken while he was with Mr. Bush, furthered that JUCA.  And finally, Bluett's sales of heroin were reasonably foreseeable to Mr. Bush.  Indeed, Mr. Bush often witnessed Bluett's actions directly because he was present when Bluett took those actions.  And though the PSR doesn't indicate whether Mr. Bush was present for the sales used to calculate Bluett's heroin activity, *see* Doc. 277 at ¶¶ 112 & 122, this question doesn't dictate the conclusion.  Mr. Bush knew from first-hand knowledge that Bluett was making heroin sales and so it was reasonably foreseeable to him that Bluett would make other heroin sales.  This is particularly true because of the interdependence shown by the undisputed parts of the PSR and the credible evidence.  In sum, the court finds that Bluett's admitted heroin sales were part of Mr. Bush's JUCA.  These sales

thus qualify as Mr. Bush's relevant conduct and the PSR properly counted them as part of his drug quantity.  The court overrules Mr. Bush's objection to including Bluett's heroin sales—as established and calculated in ¶¶ 112 and 122.

### c.   Summary

In sum, the PSR properly counted four of the drug quantities attributed to Mr. Bush's relevant conduct based on information provided by "Confidential Sources/Proffer Information/Post-Arrest Statements"—as summarized in page 2 of The Drug Chart.  They are the quantities derived from paragraphs 21 (first line on page 2 of The Drug Chart), 20 (sixth line), 29 (seventh line), 109 (partially counted at 30 grams) (ninth line), and 112 (tenth line).  These quantities amount to 1,939.8[15] grams of heroin.

### 3.   Subpart 3:  Seized from Defendants

The next contribution to Mr. Bush's drug quantity comes from paragraph 100 of the PSR.  The top of page 3 of The Drug Chart shows this quantity, 2.49 grams.

Paragraphs 99[16] and 100 summarize the facts relied on for this contribution to Mr. Bush's relevant conduct.  They are grounded in Mims's visit to the 823 Parallel residence on November 4, 2017, and his traffic stop after he left there.  In short form, Mims spent the afternoon at 823 Parallel with Mr. Bush and others.  Doc. 277 at ¶¶ 98–99.  After Mims and Mr. Bush went out to the backyard together, Mims took a clear plastic bag containing a golf ball sized "brown object."  Mims rubbed it between his fingers, pushed the air out of the bag, tied that bag, and placed it in his pocket.  *Id.*  Then, Mims left the residence and law enforcement officers followed him as he

---

[15]    The math is as follows:  226.8 grams (¶ 21) + 63 grams (¶ 20) + 180 grams (¶ 29) + 30 grams (¶ 109) + 1,440 grams (¶ 112) = 1,939.8 grams.

[16]    Mr. Bush objects to the part of paragraph 99 "providing a visual weight estimate."  Doc. 277 at ¶ 262.  Consistent with Fed. R. Crim. P. 32(i)(3)(B), the court elected not to consider the portion of this paragraph challenged by his objection.

drove to his apartment in Lawrence, Kansas.  Before he reached his destination, a Kansas

Highway Patrol Trooper conducted a traffic stop, arrested Mims on warrants, and conducted a

car search.  The search located 2.49 grams of heroin.  *Id.* at ¶ 100.  Trial testimony provided

more details about Mr. Mims's visit to the residence on November 4 and the ensuing traffic stop.

The court already has considered these facts in detail and found that Mims acquired the

2.49 grams of heroin from the house at 823 Parallel.  *See supra* at 29-30.  The sentencing record

doesn't establish by direct evidence, however, that Mr. Bush himself provided this heroin to

Mims.  But it provides ample basis to conclude that this heroin was provided as part of Mr.

Bush's JUCA.  Specifically, the court finds that Mr. Bush agreed to distribute heroin—acting

jointly with others—from the house at 823 Parallel (among other places).  *See* U.S. SENTENCING

GUIDELINE MANUAL § 1B1.3(a)(1)(B) cmt. n.3(B).  Distributing heroin to Mims from that

location on the afternoon of November 4, 2017, was well within the scope of that agreement.  To

put it succinctly, Mims came to a residence where Mr. Bush and his cohorts regularly distributed

heroin.  He left there with a distributable quantity of heroin.  If one infers that Mims acquired the

heroin during the visit to the residence—and the court finds it is more likely than not that Mims

did acquire it there—his acquisition is well within the scope of Mr. Bush's agreement to

distribute heroin in concert with others.  Next, the court finds distributing heroin to Mims

furthered the criminal activity Mr. Bush had agreed to undertake jointly.  Finally, the distribution

to Mims was reasonably foreseeable.  Mims was present inside the residence while Mr. Bush and

others discussed the effect of the organization's heroin had produced for its users and the

approximate weight of heroin chunks in the house that afternoon.  *See* Doc. 277 at ¶ 98

(undisputed).  In this context, whether Mr. Bush handed the 2.49 grams to Mims or someone else

handed it to him, it was foreseeable that Mims would acquire heroin from a heroin selling

organization that functioned from that location.

The court thus concludes that the PSR properly attributed this 2.49 grams of heroin to

Mr. Bush's relevant conduct.  The court overrules his objection challenging that proposition.

### 4.  Subpart 4:  Sale Quantities Associated with Video Surveillance at 823 Parallel

The last contribution to the PSR's drug quantity finding comes from PSR ¶¶ 73, 76, and

77.  While Mr. Bush doesn't object to all three paragraphs explicitly, the court reads his

objection to paragraph 77, *see* Doc. 277 at ¶¶ 250–52, to apply to all three of these paragraphs.

*I.e.*, *id.* at ¶ 251 ("Mr. Bush objects to the visual weight estimate that appears in *these*

*paragraphs* . . . .") & ¶ 252 (issue of visual identification of drug weight closely contested at

trial).  The court thus assumes that Mr. Bush objects to the quantities estimated in all three

paragraphs.

Paragraph 73 relies on one (or more) agent's observation based on the video and audio

captured by the Title III devices placed inside the house at 823 Parallel, *i.e.*, tiny cameras placed

inside a coffee pot and a clock radio.  They captured a sale of something taken from a "larger

chunk in a plastic bag."  Doc. 277 at ¶ 73.  Mr. Bush "pinched off a few pieces of what appeared

to be heroin from a larger chunk in a plastic bag."  *Id.*  He then handed the "smaller pieces" to an

unidentified man and counted money that was placed on a table.  Albert Brown then pinched off

some more small amounts from the "larger chunk" and placed them on a scale.  Bluett then

recited a partially unintelligible number while looking at the scale.  The unidentified man

collected the scale (which he had brought into the house with him) and the substance and left.

Brown placed the larger chunk back into the plastic bag on the table.  According to paragraph 73,

"Investigators estimated the unknown male [had] purchased approximately one ounce of

suspected heroin." *Id.*  The PSR thus counts 28.35 grams—one ounce—of heroin toward Mr. Bush's drug quantity based on this visual observation.

Paragraph 76 reports a longer and more varied conversation between Mr. Bush and James Castell—an individual viewed as one of his sources of supply of heroin.  In one exchange, Castell offers to supply "runners" and handguns to Mr. Bush.  The court finds from circumstantial evidence and the context of their conversation that the two men were discussing heroin.  Mr. Bush concludes the conversation by "hand[ing] the substance back to Castell" and he leaves.  Paragraph 76 doesn't specify a size or weight for the substance handed to Castell, but the PSR attributes 56.7 grams of heroin to Mr. Bush's drug quantity based on this exchange.

Paragraph 77 reports a similar transaction between Mr. Bush and Jermaine Paden.  This Mr. Paden entered the back door of 823 Parallel, placed cash on the coffee table, Mr. Bush counted the currency, and then placed "a small baggie on the table."  Doc. 277 at ¶ 77.  Paden then made a reference "about it being cut" and talked about "reupping" later.  The PSR makes a "conservative estimate of the amount or heroin that Bush, Jr. sold to Paden was seven grams." *Id.*  It doesn't explain, however, why this estimate is "conservative."

The court finds it more likely than not that all three paragraphs report transactions involving heroin.  Both in content and context, the preponderance of the evidence supports that conclusion.  But the court is not persuaded by the weight estimates for the heroin involved in any of these three transactions.  Any weights assigned to these transactions are estimates made by agents who watched video captured by the Title III cameras.  The court watched a considerable amount of that video during the trial, at the sentencing hearing, and during its review of the sentencing record.  While the video supplied compelling evidence for other aspects of this case, it wasn't persuasive as a medium for sponsoring reliable estimates of drug weights.  The lighting

was too inconsistent, the video product too grainy, and the cameras captured images too distant from the suspected heroin. The photographs pulled from segments of the video helped even less.

As in *United States v. Aragon*, "the photographs in this case provide a poor basis for determining how much" weight to attribute to a controlled substance. 922 F.3d 1102, 1112 (10th Cir. 2019). Estimating unseized drug weight is not a license for guessing about a specific quantity, *id.*, and the court thus sustains Mr. Bush's objection to the quantities allocated to him based on PSR ¶¶ 73, 76, and 77.[17]

The court is mindful that its conclusions about these three paragraphs in the PSR—that the transactions involved heroin but the court cannot discern a sufficiently reliable estimate of the weight of that heroin—means that some unknown quantity of illegal conduct may go uncaptured by Mr. Bush's relevant conduct. The key word in the preceding sentence is "may," for it's difficult to sort out whether transactions weighted in other parts of the PSR capture the heroin shown in these pictures. And even if the government had convinced the court that its quantity determination understated the scope of Mr. Bush's heroin trafficking activity, the court had the option to evaluate that conduct when it exercised its sentencing discretion.

In short, the court attributes zero drug weight to Mr. Bush based on Subpart 4 (video surveillance) of The Drug Chart.

---

[17]     This ruling isn't inconsistent with the court's evidentiary ruling, at trial, permitting witnesses to offer lay opinions about drug quantities captured in videos and still photographs. Mr. Bush objected to that testimony about quantities pictured in videos and photographs. The court ruled that the government had provided requisite foundation for a lay opinion "rationally based on the witness's perception." Fed. R. Evid. 701(a). But that ruling merely concluded that the government had discharged its burden under Fed. R. Evid. 104 for the court to admit the testimony. The court's decisions as an evidentiary gatekeeper didn't obligate the jury to accredit the proffered estimates. Now, at sentencing, the court functions in its role as a factfinder and must decide contested sentencing issues. In that role, it does not find estimates provided by the government's evidence sufficiently persuasive to provide a basis for estimating drug weight. In short form, the government has failed to carry its burden of persuasion on these estimates.

### 5.   Sum of the Court's Drug Quantity Findings

Based on the findings in Subparts 1 through 4, the court finds defendant George Bush, Jr. is accountable for a total of 2,217.66[18] grams of heroin (2.31 kilograms).  This quantity represents "all quantities of contraband with which he was directly involved and, in the case of [his] jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal acidity that jointly undertook."  *United States v. Zapata*, 546 F.3d 1179, 1193 (10th Cir. 2008) (quoting *Lauder*, 409 F.3d at 1267).

This finding means that the court sustains Mr. Bush's objections to the drug quantity findings in ¶¶ 116 and 117 of the PSR in part and denies them in part, as stated in full in this Order.  It also means that the court sustains his objection to ¶ 129, which calculated his Base Offense Level as Level 32.  The court finds that the correct Base Offense Level is Level 30 (which applies to a heroin offense with a drug weight of 1 to 3 kilograms of heroin).  *See* Guidelines § 2D1.1(c)(5).

### D.   The Government's Alternative Drug Quantity Calculation:  The Casino Method

In its Sentencing Memorandum (Doc. 281), the United States argues that the court should calculate Mr. Bush's allocable drug quantity based on the amount of cash he gambled at a casino in Kansas City, Kansas from 2012 to 2017.  This argument relies on five propositions.  One, Mr. Bush and his principal co-conspirator, Albert Brown, never had a job or any other legitimate means of income.  The support for this proposition comes from trial testimony about what the two men did not do during 2017—go to work.  Two, the two men took substantial sums of cash

---

[18]      The math is 275.37 (Subpart 1) + 1,939.8 (Subpart 2) + 2.49 (Subpart 3) + 0 (Subpart 4) = 2,217.66.

with them to a casino and gambled it in large amounts between 2012 and 2017.  Three, the money the two men gambled at this casino must represent proceeds from heroin trafficking since neither one of them engaged in any lawful earning enterprise during this period.  Four, the money gambled by Albert Brown qualifies as Mr. Bush's relevant conduct because heroin sales generated that money and the two men had agreed to undertake that criminal activity together.  And last, one can estimate the quantity of heroin represented by the money gambled because Mr. Bush and his partners in the JUCA typically sold heroin for about $100 per gram.

The court recognizes that many courts, including our Circuit, have approved drug quantity findings that rely on drug estimates reached by converting cash to a controlled substance.  *See, e.g.*, *Rios*, 22 F.3d at 1028 (10th Cir. 1994) ("While we have never addressed whether sums of cash can be converted to drug equivalents for purposes of sentencing, today we join our sister circuits in holding that they may, so long as the quantities are determined to be relevant quantities under § 1B1.3.").  *See also United States v. Hinson*, 585 F.3d 1328, 1341 (10th Cir. 2009).  But before a sentencing court can use this method to estimate drug quantity, it must find that the seized quantity of drugs does not reflect the scale of the offense, *id.* at 1341, and that "the cash is attributable to drug sales which were part of the same course of conduct or common scheme or plan as the conviction count."  *Rios*, 22 F.3d at 1028.

Applying these standards here, the court finds that the government hasn't carried its burden to establish the prerequisites for using its casino method to estimate Mr. Bush's allocable drug quantity.  Several reasons produce this conclusion.  For one, the court rejects the opening premise of the government's analysis.  The government asks the court to conclude that all dollars gambled by Mr. Bush *and Albert Brown* represent heroin proceeds.  The court can't make the required findings about Brown's gambled funds because the record is inadequate to find that his

gambling money "is attributable to drug sales which were part of the same course of conduct or common scheme or plan." The government has not cited any case where a sentencing court has used cash spent (or even possessed) by a defendant's partner in jointly undertaken criminal activity to estimate the defendant's drug quantity. And while the facts of a future case might justify a drug quantity estimated in that fashion, the record here doesn't. The government's model asks the court to use the money that Brown gambled during 2017 to estimate a component of Mr. Bush's drug quantity. But the sentencing record as a whole includes little information about Brown's activities in 2017. Certainly, the government has proved that Brown and Mr. Bush agreed to undertake heroin trafficking together in 2017. Indeed, they executed that agreement. So, it's rational to think that the $74,000 that Brown gambled may represent his earnings from heroin sales. But the sentencing record can't support a finding—one the government's theory requires—that all of Brown's gambling money came from heroin trafficking (or other conduct qualifying as the same course of conduct or common scheme) that he jointly undertook with Mr. Bush.

A similar problem inheres in the evidence about the dollars that Mr. Bush gambled in 2014, 2015, and 2016. The trial evidence ably demonstrated that trafficking heroin was Mr. Bush's full-time job during 2017. It, together with the undisputed parts of the PSR, also established that he engaged in heroin sales in 2016. *See, e.g.*, Doc. 277 at ¶ 21. But there is scant information in the record about heroin activity in 2015 and no such information for 2012, 2013, or 2014. This omission precludes the court from making the requisite threshold findings about Mr. Bush's gambling dollars during those years. And without those findings, the court can't use gambled dollars to estimate his allocable heroin quantity.

While the court is unwilling to adopt the casino method to determine Mr. Bush's drug quantity, that doesn't mean the evidence is unhelpful. Government Exhibit 22 from the sentencing hearing are business records from the Hollywood Casino in Kansas City, Kansas. The government introduced these same records at trial as Exhibit 142. A records custodian from that casino, David Rice, also testified about the records. He explained that the records, among other things, show the total dollars Mr. Bush took to this casino and used to "buy in" to play in the casino's gaming operations. Between late September 2012 and April 21, 2017, Mr. Bush took $241,121 to the Hollywood Casino and used it to buy in for gaming in the casino.[19] During that same period, Mr. Bush won a total of $68,351 during his visits to this casino.[20] Even assuming Mr. Bush reinvested all his casino winnings (the $68,351) in future gambling outings at this same casino, Mr. Bush took at least $172,770 in "new" money to this casino during the five years covered by Exhibit 22.

While gambling at a state licensed casino in Kansas was legal during this era, this gambling evidence is relevant because Mr. Bush had no legitimate source of income during much of this period. For example, the evidence showed that Mr. Bush didn't file tax returns for 2014, 2015, 2016 or 2017. And Allison Brown testified that in all his time in the house at 823 Parallel, he never saw any sign that Mr. Bush held a job or operated a lawful business capable of producing lawful income.

---

[19]     As Mr. Rice explained, the eighth column on page 10 (red page numbers in lower right) show the total "buy in" amount. A casino patron buys in, for example, by giving cash to a dealer in exchange for the casino's gambling chips.

[20]     The seventh column on page 10 shows the "total actual win amount." Because these are the casino records, a "win" in the columns means that the casino won money. Conversely, a negative number in this column shows that Mr. Bush won money during that casino visit.

For purposes of the drug quantity discussion, the court has focused on a subset of the time span covered by Government Exhibits 22 and 23. Taking the 2017 data from the two exhibits, the court calculated the amount of money Mr. Bush took to the Hollywood Casino and used to buy in to its gaming operations there. During calendar year 2017, he took $108,927 to the casino and used it to buy in for gaming there. His winnings during 2017 amounted to $55,058. Assuming again that he reinvested all his winnings to buy in for future gambling endeavors at this casino, he necessarily committed $53,869 "new" dollars to gambling at this one casino—all during a year when he held no job and had no source of legitimate income. The court finds by a preponderance of the evidence that the money Mr. Bush took to Hollywood casino during 2017 "is attributable to [heroin] sales which were part of the same course of conduct or common scheme or plan as the conviction count." *Rios*, 22 F.3d at 1028. The court already has found that the heroin seized does not adequately represent the scale of Mr. Bush's heroin trafficking activities, and the casino evidence reconfirms that finding.[21]

The more challenging question is how much heroin is represented by Mr. Bush's gambling dollars. The government's argument reasons that Mr. Bush and his partners in JUCA often sold heroin for $100 per gram.[22] And so, the government argues, the simplest math converts the minimum net dollars gambled during 2017—$53,869—to 530 grams of heroin. But

---

[21]    During the part of the sentencing hearing conducted on April 13, 2021, Mr. Bush offered a Declaration from David Rice. It was received into evidence as defendant's Exhibit A without objection. Mr. Rice, an employee of Hollywood Casino, testified during Mr. Bush's trial and he explained the business records establishing his gambling activity. Mr. Rice's new Declaration explains that the casino can't say whether Mr. Bush gambled with "new" money he took to the casino or, instead, won big and reinvested his winnings in future gambling at the same casino.

[22]    The early controlled purchases all used a per gram price near the $100 per gram price point. *See* Doc. 277 at ¶¶ 33 (3.25 grams for $300), 37 (5.6 grams for $630), 38 (6.74 grams for $625) & 39 (9.43 grams for $950).

as the government noted during the sentencing hearing, applying the $100 per gram price to Mr.

Bush's likely yields a conservative estimate and thus likely understates the extent of heroin

trafficking expressed by Mr. Bush's casino spending.  For instance, later (and larger) heroin sales

in 2017 used a $75 per gram price point.[23]  And if one uses that $75 base price per gram, the

$53,869 dollars that Mr. Bush dedicated to gambling at this casino during 2017 represents 718

grams of heroin.

And even a $75 per gram estimate likely is conservative because it ignores the margin

that Mr. Bush's retail workers earned for their share of trafficking, *e.g.*, meeting the customer

and closing the transaction.  Detective Evans, from the Kansas City, Missouri Police

Department, testified during the sentencing hearing.  Based on his experience in similar

investigations, Detective Evans testified that the retailer's margin typically ranges from 15 to

20%.  Applying that margin drops Mr. Bush's take to $60 to $63.75 per gram (based on the $75

per gram price).  And under that assumption, the $53,869 that Mr. Bush took to the Hollywood

Casino during 2017 translates to somewhere between 897 and 845 grams of heroin.[24]

Finally, the government's casino method likely yields a conservative estimate for yet

another reason.  Whether one uses $100 or $75 or $60 as the price point, it ignores Mr. Bush's

acquisition costs in the heroin he trafficked.  The evidence established that Mr. Bush (and his

partners in JUCA) sold heroin for price points ranging between $60 and $100 per gram.  But it's

---

[23]    As the size of the controlled purchases increased, the price dropped below $100 per gram.  *See*
Doc. 277 at ¶¶ 49 (48.89 grams purchased for $3,600, equating to about $74 per gram) & 53 (70.29 grams
for $5,300, or $75 per gram).

[24]    Specifically, if retailers realized a margin in the 20% to 15% range, the $75 per gram retail price
drops Mr. Bush's share to $60 ($75 x .20 = $60) and $63.75 ($75 x .15 = $63.75).  Assuming Mr. Bush
took, at minimum, $53,869 to the casino in 2017, those dollars represented between 897 to 845 grams of
heroin—depending on whether one uses the 20% or 15% margin reduction.

unlikely that Mr. Bush earned $60 or $100 of *profit* per gram sold.  Over time, it stands to reason that the money Mr. Bush took to the casino during 2017 represented *profits* he had made by selling heroin, not *revenue*.  Over an extended period—and the casino records established that Mr. Bush gambled large sums over an extend period—Mr. Bush had to pay his heroin supplier for the heroin he resold.  The record contains no evidence about Mr. Bush's cost of goods sold, so the court can't complete the calculation.[25]

But as the court explained at the outset of this section, the court declines to base its drug quantity finding on the dollars Mr. Bush gambled at the Hollywood Casino.  While this method isn't without some appeal, the court can't make the requisite threshold findings this analysis requires.  The gambling evidence is nonetheless useful, for it confirms that Mr. Bush reaped substantial profits from heroin trafficking activities during 2017 and, in all likelihood, other years as well.  The gambling records thus provide useful context and convince the court that its drug quantity finding (based on sources specified in the PSR and The Drug Chart) is reasonable under all the circumstances.

## II.   REVISED RULING ON AGGRAVATING ROLE (¶ 133)

The PSR applied an Aggravating Role adjustment under § 3B1.1(a) of the U.S. SENTENCING GUIDELINE MANUAL, concluding that Mr. Bush was an organizer or leader of criminal activity involving five or more participants.  Doc. 277 at ¶ 133.  He objected, claiming that no evidence demonstrated "that Mr. Bush was in fact controlling or ordering others to

---

[25]     A hypothetical makes the point.  Mr. Bush's net profit drops to $40 per gram if (using $100 per gram as the retail price point) one assumes that:  (a) Mr. Bush provided heroin to his retailer runners for $80 (the 20% reduction Detective Evans opined); and (b) Mr. Bush acquired heroin for 50% of the price he sold to retailers.  With these assumptions, the $55,058 that Mr. Bush gambled during 2017 translates to 1,376 grams.

perform transactions." *Id.* at ¶ 287.  He argued that Albert Brown was the leader/organizer.  *Id.* at ¶ 288.

At the hearing on December 21, 2020, the court sustained Mr. Bush's objection in part.  It concluded that the government had proved the requisite headcount (five or more participants) but hadn't carried its burden to establish that Mr. Bush was an organizer/leader.  Instead, the court ruled, Mr. Bush was a manager or supervisor under § 3B1.1(b).  This part of the court's rulings stands.

But during the same hearing, the court mistakenly concluded that Mr. Bush should receive the two-level adjustment specified in § 3B1.1(c), not three levels under 3B1.1(b).  This part of the ruling was wrong.  A manager/supervisor of criminal activity involving five or more participants receives a three-level adjustment under § 3B1.1(b), not two levels. The court thus revises its earlier ruling, concluding that Mr. Bush qualifies for a three-level adjustment but not the four levels imposed in ¶ 133 of the PSR.

## Conclusion

For the reasons specified in this Order, the court found that the total quantity of heroin attributed to defendant George Bush, Jr. is 2,217.6 kilograms.  This ruling produces a Base Offense Level of 30 under Guidelines § 2D1.1(c)(5).  Corresponding to this ruling, the court sustains defendant's objection to ¶ 129 of the PSR in part and denies it in part, as set forth in full in this Order.

Also, the court revises one of its earlier rulings.  It sustains defendant's objection to the adjustment applied in ¶ 133 of the PSR, in part, but denies it in part.  The court rules that Mr. Bush was a manager/supervisor (but not an organizer or leader) of a criminal activity that involved five or more participants.  This ruling means that the PSR mistakenly applied a four-

level adjustment in paragraph 133 instead of a three-level adjustment under § 3B1.1(b).  This ruling supersedes the court's oral ruling during the hearing on December 21, 2020.

The court is mindful that its rulings on objections to ¶ 129 and ¶ 133 have downstream affects for findings in ¶ 138 (Total Offense Level) and ¶ 185 (Guideline Provisions).  Mr. Bush objects to both of those paragraphs.  *See* Doc. 277 at ¶¶ 289-90 & 291-92.  The court thus sustains his objections in part and overrules them in other respects, as explained in this Order. The court made the findings addressed in ¶ 138 and ¶ 185 during the final iteration of the sentencing hearing.

**IT IS SO ORDERED.**

**Dated this 21st day of April, 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**